## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

**Appeal No.: 17-2890**

| | | |
|---|---|---|
| RAY K. HAYNES, | ) | Appeal from the U.S. District Court |
| | ) | for the Southern District of Indiana, |
| Plaintiff-Appellant, | ) | Indianapolis Division |
| | ) | |
| vs. | ) | |
| | ) | |
| INDIANA UNIVERSITY, THE BOARD OF | ) | |
| TRUSTEES OF INDIANA UNIVERSITY, | ) | |
| MICHAEL A. McROBBIE, in his official | ) | |
| and individual capacity, LAUREN K. ROBEL, | ) | |
| in her official and individual capacity, ELIZA | ) | |
| PAVALKO, in her official capacity, THOMAS | ) | Cause No. 1:15-cv-1717-LJM |
| F. GIERYN, in his official and individual | ) | |
| capacity, TERRENCE C. MASON, in his | ) | |
| official capacity, GERARDO M. GONZALEZ, | ) | The Hon. Larry J. McKinney |
| in his official and individual capacity, GARY | ) | |
| M. CROW, in his official capacity, JOYCE M. | ) | |
| ALEXANDER, in her official and individual | ) | |
| capacity, and THOMAS A. BRUSH, in his | ) | |
| official and individual capacity, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

## <u>CORRECTED\* BRIEF OF APPELLANT</u>

Kevin W. Betz
Sandra L. Blevins
Courtney E. Endwright
BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com

*Attorneys for Plaintiff-Appellant Ray K. Haynes*

\* Corrected in accordance with the Court's November 21, 2017, Brief Deficiency Letter and subsequent clarifying conversations with the Court Clerk.

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 17-2890

Short Caption: Ray K. Haynes v. Indiana University, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Ray K. Haynes

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Betz + Blevins

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature:  s/  Sandra L. Blevins                          Date: 11/20/2017

Attorney's Printed Name:  Sandra L. Blevins

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes**  ✕  **No** _____

Address:  One Indiana Square, Suite 1660

Indianapolis, IN 46204

Phone Number:  (317) 687-2222                    Fax Number:  (317) 687-2221

E-Mail Address:  sblevins@betzadvocates.com

rev. 01/15 GA

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ...........................................................................................i

TABLE OF CONTENTS ................................................................................................ii

TABLE OF AUTHORITIES .......................................................................................viii

I.     JURISDICTIONAL STATEMENT .................................................................1

II.     STATEMENT OF THE ISSUES ....................................................................1

III.     STATEMENT OF THE CASE........................................................................4

       III.A.     On April 4, 2017, the district court granted Haynes's Motion to Reconsider...................................................................................4

       III.B.     The briefing schedule was set according to the district court's briefing completion deadline...................................................................4

       III.C.     Because Haynes's two experts had no time to examine six deposition transcripts totaling nearly 900 pages and to fully prepare an analysis of these 900 pages within the context of the over 11,000 pages of discovery documents, Haynes requested additional time for the experts to prepare and finalize their reports ...................................................5

       III.D.     The district court granted SOE's summary judgment motion and motion to strike in their entirety, leading to this timely appeal ...................6

       III.E.     Factual Background .........................................................................7

             III.E.1.     The IU School of Education has never granted tenure to an African-American male in its 100+ year existence.............................7

             III.E.2.     Haynes's tenure review was predetermined and suffered from his reviewers' implicit bias ........................................................8

             III.E.3.     After a successful career in the corporate world, Haynes moved to academia.............................................................................9

             III.E.4.     Haynes sought tenure in August 2013 with little assistance from Brush ...............................................................................11

             III.E.5.     The tenure process administered by SOE for Haynes was fraught with procedural defects.................................................12

a.  SOE Executive Associate Dean Joyce Alexander controlled the selection of external reviewers and only provided Haynes with three in-field reviewers .................................................................................12

b.  Alexander misrepresented Kochan's external review as negative and specifically told Haynes's department chair to "vote no" to Haynes's tenure application .................................................................13

c.  When more external reviewers were necessary, Chair Brush suggested external reviewers with known negative reputations .....13

III.E.6.  All other external reviews endorsed Haynes .....................................14

III.E.7.  The IST Department tenure vote favored Haynes ...........................15

III.E.8.  Brush, Haynes's Department Chair, provided a tepid vote in favor of Haynes but withheld crucial information from Haynes ..............16

III.E.9.  Glazewski, Brush's protégé, controlled and manipulated the SOE Promotion and Tenure Committee report against Haynes..............17

III.E.10.  Based on Alexander's analysis, Dean Gonzalez recommended against tenure based on this same erroneous information...............18

III.E.11.  Vice Provost Gieryn and campus Tenure Advisory Committee voted against Haynes and relied on erroneous and incomplete information provided by previous levels of review..........................19

III.E.12.  Subsequent decisions by Provost Robel, the Faculty Board of Review, and President McRobbie decisions were based on the same erroneous and incomplete information .............................................20

III.E.13.  Cho and Ottenbreit-Leftwich, who were not African-Americans, received unanimous votes for tenure, even though concerns were raised with each application.................................................................21

a.  Cho was less independent than Haynes and had issues with her teaching evaluations, but each issue was overlooked at every level of review .............................................................................................21

b.  Ottenbreit-Leftwichwas dependent on her mentors and colleagues for her research and grant funding.......................................................21

IV.  SUMMARY OF THE ARGUMENT .........................................................................22

V.       LEGAL ARGUMENT.......................................................................................24

    V.A.        Standard of Review.....................................................................24

        V.A.1.     Motion for Summary Judgment..........................................24

        V.A.2.     Motion to Strike experts ...................................................24

            a.     Motions to strike in the summary judgment process are
                 specifically disfavored ....................................................24

            b.     This Court reviews de novo whether the district court applied
                 the proper framework and reviews whether the decision to
                 exclude was an abuse of discretion ...............................25

        V.A.3.     Tenure Decisions..............................................................25

    V.B.        Because Perna's timely testimony was relevant and directly helpful to the
        trier of fact, the district court should have considered her opinions..........25

        V.B.1.     In an abuse of discretion, the district court excluded Perna's expert
            testimony, though it was timely, based on relevance and a lack
            assistance to the factfinder ................................................25

        V.B.2.     Perna was well-qualified to offer expert opinions on best practices
            for tenure review processes...............................................26

        V.B.3.     In excluding Perna's opinion comparing Haynes's research with
            another recent IST Department tenure candidate, the district court
            ignored Perna's analysis as well as the criteria used by all voters in
            Haynes's tenure review process ..........................................28

        V.B.4.     The defects identified by Perna in SOE's assignment of external
            reviewers as well as other missteps in the tenure review process
            were identified through her vast experience in tenure reviews .......30

    V.C.        The District Court's exclusion of Haynes's expert testimony was without
        cause. Both experts provided timely, relevant, and helpful testimony on
        material issues ...............................................................30

        V.C.1.     Perna's expert report responded to SOE's objections to her initial
            declaration as well as IU's new arguments raised in its Reply .........30

V.C.2.　Haynes submitted his expert reports with his Surreply (and later Motion to Supplement) instead of his Response because of an extremely constricted briefing timeline................................................32

V.C.3.　Each expert offered expert testimony relevant to material issues in the case, including pretext and SOE's assertion of the same actor influence ...............................................................................33

    a.　Greenwald offered critical testimony on pretext and the same actor influence................................................................33

    b.　Perna similarly offered relevant and material expert testimony on pretext and the same actor inference ...................................34

V.C.4.　At a minimum, each expert offered expert testimony that was relevant to material issues raised in SOE's Reply, including SOE's assertion of qualified immunity ...........................................35

    a.　The district court misconstrued the exceptions to qualified immunity as solely requiring a known constitutional violation .......35

    b.　Perna's opinions were relevant to SOE's qualified immunity defense ..............................................................................36

    c.　Greenwald's testimony was also relevant to the issue of qualified immunity...........................................................................37

V.D.　All inferences were made in favor of SOE, and material evidence was ignored or misrepresented by the District court. Thus, the Seventh Circuit should reverse the District Court's decision granting SOE's Motion for Summary Judgment.......................................................................39

V.D.1.　By ignoring and misconstruing critical evidence, the district court improperly made all inferences in SOE's favor................................39

    a.　The district court misrepresented SOE's own statements on the known negative reputations of the external reviewers assigned to Haynes...............................................................................39

    b.　The district court ignored evidence that not all IST Department faculty had approved the revised summaries ...................................40

    c.　Haynes cited evidence directly stating Cho's negative teaching evaluations were glossed over during her tenure review.................40

    d.   Evidence related to Glazewski's substantive changes to the PTC Report was improperly discarded by the district court.....................41

V.D.2.    The district court committed a legal error in ignoring evidence seemingly because it was self-serving, despite other evidence that supported Haynes's assertions............................................................42

    a.   The district court omitted evidence that Haynes had corrected the issues identified in his third-year review and even achieved an "exemplary" rating on his research only months before his tenure review ......................................................................................42

    b.   The district court omitted Haynes's evidence that the teaching evaluation numbers presented at the IST Department were misrepresented .........................................................................43

V.D.3.    The trial court ignored highly relevant direct evidence in what appeared to be a misapplication of this Court's instruction in *Ortiz* ..................................................................................................44

    a.   The district court ignored multiple pieces of circumstantial evidence presented by Haynes, without basis ....................................................44

    b.   The district court ignored that the IU SOE has never granted tenure to an African-American male in its over 100-year existence ..................................................................................................45

    c.   The district court also omitted undisputed evidence that SOE marginalized its minority faculty..........................................................45

    d.   The district court ignored the IST Department faculty showed animosity against Haynes...................................................................46

    e.   Although she controlled and manipulated Haynes's tenure review process, the district court failed to consider any of Alexander's misrepresentations or actions against Haynes ...................................47

    f.   The racially discriminatory undertones in Hardré's external review of Haynes were never mentioned by the district court ...................48

V.D.4.    The district court even assumed SOE made arguments that were never made, prohibiting Haynes from responding to a new argument in his Surreply....................................................................49

V.E.     Because Equitable tolling should have applied, Hayne's Title VII claim should not have been forfeited ........................................................................50

VI.    CONCLUSION.....................................................................................................51

VII.   CERTIFICATE OF COMPLIANCE.................................................................53

VIII.  DIGITAL MEDIA STATEMENT........................................................................53

IX.    STATEMENT OF INCLUSION .......................................................................53

X.     PROOF OF SERVICE .........................................................................................54

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505 (1986)........................................................24, 37, 51

*Bamcor LLC v. Jupiter Aluminum Corp.*, 767 F. Supp. 2d 959 (N.D. Ind. 2011) ..........................24

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887 (7th Cir. 2011)....................................................26

*Boss v. Castro*, 816 F.3d 910 (7th Cir. 2016) ...................................................................................44

*Castrillon v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 2015 U.S. Dist. LEXIS 69530 (S.D. Ind. May 29, 2015)........................................................................................................................26-27

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) .............................................................................44

*Douglas v. Potter*, 268 F. App'x 468 (7th Cir. 2008) .......................................................................50

*Estate of Perry v. Wenzel*, 872 F.3d 439 (7th Cir. 2017) .................................................................51

*Jackson v. Potter*, 240 F. App'x 136 (7th Cir. 2007) ...................................................................50-51

*Kennedy v. United States Postal Serv.*, 2013 U.S. Dist. LEXIS 41904 (N.D. Ind. Mar. 25, 2013) ................................................................................................................................................27

*Kernats v. O'Sullivan*, 35 F.3d 1171 (7th Cir. 1994) ...................................................................35-36

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ......................................................................26

*Malozienc v. Pac. Rail Servs.*, 606 F. Supp. 2d 837 (N.D. Ill. 2009)...............................................51

*Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796 (7th Cir. 2013) ....................................................25

*McKinney v. Office of the Sheriff*, 866 F.3d 803 (7th Cir. 2017) .....................................................42

*Mull v. ARCO Durethene Plastics, Inc.*, 784 F.2d 284 (7th Cir. 1986)............................................50

*Mullenix v. Luna*, 136 S. Ct. 305 (2015) .........................................................................................36

*Namenwirth v. Bd. of Regents of Univ. of Wisc. Sys.*, 769 F.2d 1235 (7th Cir. 1985) ........................25

*Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) .......................................................43-44

*Patton v. MFS/Sun Life Fin. Distribs.*, 480 F.3d 478 (7th Cir. 2007)........................................26

*Perez v. Thorntons, Inc.*, 731 F.3d 699 (7th Cir. 2013)........................................24

*Rednour v. Wayne Twp.*, 51 F. Supp. 3d 799 (S.D. Ind. 2014) ........................................31

*Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097 (2000)........................................24

*Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500 (1957)........................................44

*Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772 (7th Cir. 2013) ........................................24

*Silk v. City of Chi.*, No. 95 C 0143, 1996 U.S. Dist. LEXIS 8334 (N.D. Ill. June 4, 1996) ........................................35-36

*Smith v. I-Flow Corp.*, 2011 U.S. Dist. LEXIS 47197 (N.D. Ill. May 3, 2011) ........................................26-27

*Sperry v. Barggren*, 523 F.2d 708 (7th Cir. 1975) ........................................51

*Stark v. Dynascan Corp.*, 902 F.2d 549 (7th Cir. 1990)........................................50

*Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753 (7th Cir. 2013) ........................................25-26

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014)........................................37-38

*Truitt v. Indianapolis Hous. Agency*, No. 1:11-cv-1227-JMS-MJD, 2012 U.S. Dist. LEXIS 179300 (S.D. Ind. Dec. 19, 2012) ........................................24

*Volling v. Kurtz Paramedic Servs.*, 840 F.3d 378 (7th Cir. 2016)........................................44

*Williams v. Lovchik*, 830 F. Supp. 2d 604, 623 (S.D. Ind. 2011) ........................................24

**Rules**

Fed.R.Evid. 401 ........................................26

Fed. R. Evid. 702........................................25-26

Southern District of Indiana Local Rule 56.1........................................24

**Statutes**

28 U.S.C. § 451 ........................................1

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 1331 ........................................................................................................1

28 U.S.C. § 1343 ........................................................................................................1

42 U.S.C. § 2000e-5 ...................................................................................................1

42 U.S.C. § 1981 ........................................................................................................1

42 U.S.C. § 1983 ....................................................................................................1, 4

## I.     JURISDICTIONAL STATEMENT

This is an appeal taken from a final order and judgment entered on August 18, 2017, in the District Court for the Southern District of Indiana, Indianapolis Division, by the Honorable Larry J. McKinney, granting Defendants-Appellees' Motion for Summary Judgment against Plaintiff-Appellant Ray K. Haynes. The Notice of Appeal was timely filed on September 12, 2017. No other motions are pending before the district court.

The district court had jurisdiction of this case pursuant to 28 U.S.C. §§ 451, 1331, and 1343, 42 U.S.C. § 2000e-5, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. Haynes sought relief below for violations of Section 1981(b) of the Civil Rights Act of 1871, as amended ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Haynes sought relief for the Section 1981 claim under 42 U.S.C. § 1983. The federal questions at issue were whether Defendants violated the provisions of Section 1981 and Title VII. This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291, which permits review of all final decisions issued by a district court.

## II.     STATEMENT OF THE ISSUES

1.     The district court excluded a timely Declaration by Haynes's expert, Dr. Laura Perna, even though she has examined approximately 100 tenure applications in schools of education and is internationally renowned, because her testimony was allegedly irrelevant and unhelpful to the trier of fact and because the analysis allegedly just involved counting. Perna's expert testimony was relevant to show that a similarly-situated comparator was treated more favorably than Haynes. Perna found Haynes's research was "at least comparable to that of Ottenbreit-Leftwich," and "[i]f Ottenbreit-Leftwich's record

1

demonstrated 'excellence' in research, then so d[id] the record of Haynes." (App-2359). This was far more than a simple counting exercise; it was an in-depth examination of the research record of Haynes and a comparator, using the same factors cited by Indiana University's School of Education ("SOE") during the review of Haynes's tenure application. Perna examined the tenure review process and found multiple deficiencies, leading her to conclude that "various aspects of the promotion and tenure process were not appropriately executed for Haynes," especially "the selection of his external reviewers." (App-2359). Perna's testimony demonstrated the discrimination against Haynes and showed pretext. Because Perna's timely expert testimony was highly relevant and extremely helpful to the trier of fact, was the district court's decision to exclude Perna an abuse of discretion?

      2.      According to Dr. Anthony G. Greenwald, an expert in the subject of implicit bias involving "implicit attitudes and implicit stereotypes" (App-2876¶16):

> Attitudes and stereotypes associated with a group rendered salient by its infrequency in a workplace are . . . more likely to be activated (and thereby to influence judgment and action) than in a workplace in which the same group is more substantially represented (having "critical mass"). As a consequence, the likelihood that implicit attitudes and stereotypes associated with a plaintiff's race or ethnicity will influence judgments made of that plaintiff by others is greater than if there were more representatives of that race or ethnicity in the work setting.

(App-2885-86¶31). IU's SOE extended its more than 100-year streak of failing to ever grant tenure to an African-American male when it denied Haynes's tenure application and terminated his employment. Haynes's tenure process expert testified that Haynes was denied "a fair and substantive evaluation on its academic merits;" instead, defects and irregularities in the process for Haynes "strongly suggest[ed] that the denial of tenure for [ ] Haynes was the result of more than just a differing judgment or differing discretion by faculty members."

(App-2792-93). Instead, Perna testified, the tenure process was a sabotage "executed in a way that seemingly pre-determined the result to deny tenure to Haynes." (App-2793).

The district court, however, denied Haynes's request to supplement his designation of evidence with these crucial opinions because they were not submitted with his response in opposition to *Defendants' Motion for Summary Judgment*. These experts were unable to offer full expert opinions when Haynes's response brief was due because Haynes's counsel had a constricted, less than two-week period to review 900 pages of deposition testimony. The district court instructed Haynes not to request additional time for his response, yet it denied Haynes's motion to supplement because he allegedly should have known to ask for more time to submit these reports with his response. Given the district court's absolute timeline, Haynes could not file his experts' reports with his response. Thus, was the district court's denial of Haynes's motion to supplement an abuse of discretion?

3.      In granting *Defendants' Motion for Summary Judgment*, the district court ignored key evidence, misrepresented material evidence, and granted all inferences in favor of Defendants, including ingoring and misrepresenting clear language from an email showing Haynes's department chair was aware of the negative reputations for two external reviewers he recommended to Haynes. The district court even made a credibility determination in finding equitable tolling did not apply to Haynes, finding Haynes' assertion that "'key documents' provided in March 2015 provided him the information necessary to put the pieces together" was "baseless." (App-3423-24). Given that the district court failed to properly consider the evidence and make all reasonable inferences in Haynes's favor as well

as made judgments on the evidence that are reserved for the fact finder, did the district court improperly grant summary judgment on Haynes's Title VII claim?

### III. STATEMENT OF THE CASE

On October 29, 2015, Haynes filed a Complaint for Damages and Trial by Jury against Defendants-Appellees Indiana University, the Board of Trustees of Indiana University; Michael A. McRobbie, Lauren K. Robel, Eliza Pavalko, Thomas F. Gieryn, Terrence C. Mason, Gerardo M. Gonzalez, Gary M. Crow, Joyce M. Alexander, and Thomas A. Brush (collectively "SOE") seeking to recover under Title VII and Section 1983 for race discrimination after SOE denied tenure to Haynes because of his race, African-American. On December 17, 2015, the SOE filed its Answer to Haynes's Complaint.

### III.A. ON APRIL 4, 2017, THE DISTRICT COURT GRANTED HAYNES'S MOTION TO RECONSIDER.

By its April 4, 2017 Order, the district court granted Haynes leave to take six additional depositions in this matter on a restricted timeframe. The depositions occurred between April 17 and April 20, 2017. (App-448). Haynes requested expedited transcripts, but the transcripts were not received by Haynes's counsel until April 24, 2017. (App-3382-83). The April 4, 2017 Order explicitly stated: "The parties should not expect to receive extensions of their deadlines for briefing Defendants' motion for summary judgment that would threaten the ability to have that motion fully briefed by May 26, 2017." (App-449¶3).

### III.B. THE BRIEFING SCHEDULE WAS SET ACCORDING TO THE DISTRICT COURT'S BRIEFING COMPLETION DEADLINE.

To comport with the district court's Order, Haynes proposed a briefing schedule, which required Haynes to file his summary judgment response by May 5, 2017 and SOE to

4

file its reply by May 26, 2017. (App-3382-83). The district court approved this briefing schedule. (App-3383). Haynes's response deadline was later extended to May 7, 2017, due to extenuating circumstances. *Id.*

**III.C. BECAUSE HAYNES'S TWO EXPERTS HAD NO TIME TO EXAMINE SIX DEPOSITION TRANSCRIPTS TOTALING NEARLY 900 PAGES AND TO FULLY PREPARE AN ANALYSIS OF THESE 900 PAGES WITHIN THE CONTEXT OF THE OVER 11,000 PAGES OF DISCOVERY DOCUMENTS, HAYNES REQUESTED ADDITIONAL TIME FOR THE EXPERTS TO PREPARE AND FINALIZE THEIR REPORTS.**

On April 25, 2017 and at the request of his experts, Haynes sought an enlargement of time to May 30, 2017, to disclose his experts because the experts were "preparing and reviewing finals and grades for their classes at the end of the spring 2017 term" and lacked "sufficient time to examine either the depositions recently completed or the continuing trickle of supplemental documents provided by Defendants to Haynes." (App-3383). This deadline was extended two additional days to June 1, 2017 because two of Haynes' experts needed additional time because they were traveling. *Id.* SOE did not object to either extension. *Id.* On June 1, 2017, the expert reports for Haynes were finalized and served on SOE. *Id.*

Any alleged delays by Haynes pale in comparison to Defendants' dilatory conduct throughout discovery. (App-3174). SOE placed unreasonable impediments on Haynes and failed to meet its discovery obligations, including taking as many as 385 additional days to provide a privilege log and 400 days to produce responsive documents to Haynes's discovery requests. (App-3174). SOE even unilaterally halted Haynes's deposition and prohibited any cross-examination by his counsel. (App-2347-48¶32).

| Date | Event |
|---|---|
| 3/27/2017 | SOE's Motion for Summary Judgment filed. (App-29-67). |
| 4/4/2017 | District court's Order set a **May 26, 2017** deadline for *Defendants' Motion for Summary Judgment* to be fully briefed. (App-449¶3). |
| 4/17/2017 –4/20/2017 | Haynes took six depositions allowed by the Court's April 4, 2017 Order. (App-3383). |
| 4/24/2017 | Last of six transcripts, totally nearly 900 pages, delivered to Haynes. (App-3383). |
| *Approximately* 4/25/2017 | Haynes sought an unopposed extension, which was granted by the district court after his counsel learned his intended experts were unable to complete their reports by May 1, 2017. (App-3383). |
| 5/7/2017 | Less than two weeks after receiving final deposition transcripts, Haynes filed his *Response in Opposition to Defendants' Motion for Summary Judgment.* (App-450). Perna's declaration was timely submitted as part of Haynes's Designation of Evidence. (App-2356-2424). |
| 5/26/2017 | SOE filed its Reply in Support of Motion for Summary Judgment. (App-2655). |
| 5/30/2017 | Haynes sought two additional days to disclose experts because of travel schedules (unopposed and granted by the district court). (App-3383). |
| 6/1/2017 | Haynes served his expert reports on SOE. (App-3383). |
| 6/5/2017 | Haynes filed his *Motion for Leave to File Surreply in Opposition to Defendants' Motion for Summary Judgment.* (App-2729). |
| 6/6/2017 | Haynes filed his Motion to Supplement. (App-2928). |

### III.D. THE DISTRICT COURT GRANTED SOE'S SUMMARY JUDGMENT MOTION AND MOTION TO STRIKE IN THEIR ENTIRETY, LEADING TO THIS TIMELY APPEAL.

On March 27, 2017, SOE filed its *Motion for Summary Judgment.* Haynes filed his

*Response in Opposition to Defendants' Motion for Summary Judgment* on May 7, 2017. On May 26,

2017, SOE filed its *Motion to Strike Report of Laura W. Perna* ("Motion to Strike") as well as its

*Reply in Support of Motion for Summary Judgment.* Per the Court's July 31, 2017 Order, granting in part and denying in part Haynes's *Motion for Leave to File Surreply in Opposition to Defendants' Motion for Summary Judgment*, Haynes filed his *Surreply in Opposition to Defendants' Motion for Summary Judgment* on August 7, 2017.

On August 11, 2017, Haynes filed a *Motion for Relief under Rule 60*. On August 18, 2017, the Court granted SOE's *Motion for Summary Judgment* and *Motion to Strike* in their entirety and granted in part Haynes's *Motion to Reconsider*. On September 12, 2017, Haynes timely filed his Notice of Appeal.

## III.E. FACTUAL BACKGROUND

### III.E.1. The IU School of Education has never granted tenure to an African-American male in its 100+ year existence.

The IU SOE has never granted tenure to an African-American male in its over 100-year existence. *See* App-2240 at 280; App-1852 at 85; App-2009-10 at 87-89; App-2015-16 at 112-13; App-2425-35; App-715; App-2111 at 45-46. SOE recognized this lack of diversity. (App-1557-58; App-542-59; App-1071-1260). In the September 2011 Affirmative Action Plan for Women and Minorities, SOE's goal was to "build[] an exciting, diverse faculty, one that more closely resembles the availability of faculty of color . . . in the workforce" by "working to recruit, retain, and promote faculty of color . . . ." (App-1567).

To accomplish this goal, SOE established the "IUB Mentoring Program" designed to "serve[] as a tool for retaining the best faculty by reducing the problems many new faculty members, especially faculty of color, are confronted with on a new campus," including "a sense of isolation and alienation from existing collegial networks, uncertainty over policies and procedures, and lack of social engagement." (App-1567).

Despite these initiatives, which have been ongoing since at least 1969 (App-1541), SOE currently has no tenured African-American males in SOE. (App-2015-16 at 112-13). While he was at SOE, Haynes was one of only two African-American men on the tenure-track faculty in SOE of approximately 110 other faculty members. No African-American males voted on Haynes's tenure application. (App-2018 at 122; App-2341¶10). Moreover, when Haynes applied for tenure, the Instructional Systems Technology ("IST") Department had not denied tenure to anyone since 1991, and no one was denied tenure except Haynes. (App-710; App-561; App-1902 at 169).

### III.E.2. Haynes's tenure review was predetermined and suffered from his reviewers' implicit bias.

Because of multiple, material defects during the tenure process, the "tenure and promotion process for Haynes was not executed as agreed, promised, and required by written Indiana University policies and procedures," causing Haynes' record to "not receive a fair and substantive evaluation on its academic merits." (App-2792-93). Thus, "the tenure and promotion process for Haynes was executed in a way that seemingly pre-determined the result to deny tenure to Haynes." (App-2792-93).

Some of the significant defects included: (a) Haynes's receiving an exemplary rating in research only months before his tenure review (App-2778); (b) misrepresentations of Haynes's external reviews by a supposed neutral in the process (App-2779-80; App-2785); (c) using external reviewers outside of the tenure applicant's area of specialty and holding external reviewers' refusals to review Haynes against him (App-2783-84); (d) recommendations by Haynes's chair of external reviewers who were known to be negative

8

(App-2786); (e) "[d]ifferential weighting of concerns for Dr. Cho and Haynes"(App-2787; App-2791-92).

These defects occurred in an atmosphere at SOE where African-American male faculty were almost nonexistent. (App-2341¶9; App-2425-35). This atmosphere drastically increased "the likelihood that implicit attitudes and stereotypes associated with [Haynes's] race or ethnicity [would] influence judgments made of [Haynes]." (App-2885-86¶31).

### III.E.3.  AFTER A SUCCESSFUL CAREER IN THE CORPORATE WORLD, HAYNES MOVED TO ACADEMIA.

After working for a Fortune 100 corporation, Haynes obtained his Ph.D. from the University of Louisville in 2003. (App-1302-1303; App-1371). Haynes's specialization was Human Resources Development ("HRD"). (App-1371). Haynes's academic research focuses on developmental relationships (i.e., mentoring) aimed at producing leader development in organizational settings as well as formal developmental programs intended to aid the socialization and integration of underrepresented minorities. (App-1371-72; App-2339¶1).

In August 2008, Haynes, an African-American male, began a tenure-track position within SOE as part of the faculty in the IST Department. (App-145; App-2340¶2). Haynes was hired using diversity initiative funding, which supplied 75% of his salary and benefits. (App-1725).

During Haynes's faculty appointment, he felt marginalized by SOE faculty because he did not belong with the "in" group—he was not invited to social lunches or social functions beyond normal faculty meetings that might include lunch. (App-2340-41¶6). Except for two instances, one of which Haynes initiated, Haynes was also not invited to be part of research

or writing projects with any of the IST Department professors. (App-2341¶7). In an April 2014 external report, it was ". . . clear to the external review team that there are perceptions from faculty and students that there are 'clicks' [sic] or 'in groups' among the faculty," and "[w]hile those perceived to be in the 'clicks' [sic] may not see it as such, the perception that they exist is a challenge facing the program." (App-2475-76).

Furthermore, Haynes's assigned mentor, Barbara Bichelmeyer, was rarely available, leaving Haynes with little to no support preceding his application for tenure. (App-2341¶11; App-1833 at 12). Bichelmeyer assigned herself as Haynes's mentor but admitted she "dropped the ball on external reviewers for Ray and Yonjoo;" Bichelmeyer had not "been much present in IST or the [SOE] over the past several years" because she was working in an administrative position at a different campus. (App-1338; App-1849 at 75-76; App-1850 at 78–80). Bichelmeyer failed to present Haynes's application for tenure to the IST Department. *Id.* Instead, another faculty member unfamiliar with Haynes's specialty, who had never presented a case for tenure, was chosen to present Haynes's case. (App-1834 at 15; App-1850 at 78-79; App-1304). Although Haynes's teaching was evaluated and highly praised by two respected, full professors, none of the IST Department faculty ever provided an in-person evaluation of Haynes's teaching or any substantive feedback. (App-2341-42¶12; App-2089 at 77).

Chair Brush never attempted to establish a rapport with Haynes. (App-2201 at 121-22). Instead, Brush had a "standoffish disposition and attitude" with Haynes; he never went to lunch with Haynes or had any meetings "beyond typical faculty meetings." *Id.* Brush has

10

no African-American friends in Indiana, where he has lived for 15 years, or any professional colleagues who are African-American. (App-2033-34 at 183, 186-87).

### III.E.4. Haynes sought tenure in August 2013 with little assistance from Brush.

At SOE, decisions on whether to grant a candidate tenure usually occur during the sixth year of employment. (App-503; App-515; App-519). To receive tenure, a candidate usually must attain excellence in one of three categories (research, teaching, or service) and receive a satisfactory rating in the other areas. (App-504; App-520; App-743).

During his third-year review tracking his progress towards tenure, Haynes was given several areas of improvement. (App-2340¶4). Haynes focused on these areas of improvement in the following years and corrected these deficiencies. (App-2340¶4; App-2342¶14). Other than this third-year review, Haynes was not informed of any serious performance deficiencies that jeopardized his case for tenure. (App-2340¶4). Instead, Haynes enjoyed success, receiving the Best Paper Award in 2010 for the Management Education and Development Division of the Academy of Management and a nomination for the School of Education Faculty Mentor Award in 2012. (App-1293). Haynes was also part of a team that received a $1.4 million grant from the National Science Foundation in 2013. (App-2342¶16). In his February 26, 2013, annual review, conducted seven months before his tenure review by the IST Department, Haynes was rated as "exemplary" in the area of research. (App-539).

Haynes sought tenure in or around August 2013 based on excellence in research. (App-1370). Another faculty member in Haynes's IST Department, Dr. Yonjoo Cho, also applied for tenure at the same time as Haynes, and she received tenure. (App-2342¶17). Cho is not African-American. *Id.* The previous year, Anne Ottenbreit-Leftwich received tenure

based on excellence in research. (App-2359¶16). Ottenbreit-Leftwich's level of research was at least comparable to Haynes's level of research, if not less impressive. (App-2359¶16; App-2348-49¶¶ 34-37).

Haynes sought Brush's assistance on multiple occasions leading up to his tenure application, but Brush's responses were often vague or unhelpful. (App-2342¶15). Haynes invited Brush to attend a workshop on preparing the tenure dossier, but Brush never responded. *Id.* Haynes attended two workshops on the tenure application process by himself, although it was recommended that Department Chairs attend with the applicants. (App-2342¶15; App-2179 at 33-35). After Haynes attended a meeting alone, Brush told Boling that he had received "some feedback from a couple of people" that specifically asked, "Do[es] [Haynes and Cho] have a clue what they need to do to prepare their T&P materials? They were asking some really odd questions." (App-771). Brush never met with Haynes on this issue. (App-2179 at 33-35).

### III.E.5. The tenure process administered by SOE for Haynes was fraught with procedural defects.

#### a. *SOE Executive Associate Dean Joyce Alexander controlled the selection of external reviewers and only provided Haynes with three in-field reviewers.*

Former Executive Associate Dean of SOE, Joyce Alexander, "control[led] the [tenure review] process," including assigning external reviewers for Haynes and Cho. (App-1801 at 170). Nonetheless, the IU Guidelines for Tenure and Promotion Reviews as of February 28, 2013, required external reviewers to be "leaders in the candidate's field." (App-745). Three out of six external reviewers selected for Haynes by Alexander were not "leaders" in Haynes's field of Human Resource Development, as required. (App-2343¶19).

*b. Alexander misrepresented Kochan's external review as negative and specifically told Haynes's department chair to "vote no" to Haynes's tenure application.*

Alexander's task was to "move the process along" but "not to enter judgment" (App-1783 at 97; App-1805 at 187), yet Alexander actively worked against Haynes's tenure application. On July 19, 2013, Alexander met with Brush about Haynes's tenure application and misrepresented the content of an external review by former Dean at Auburn University, Dr. Frances Kochan. *Compare* App-611 *with* App-781-82. Alexander told Brush that Kochan's letter was "lukewarm." (App-781-82). But Kochan concluded Haynes's research was "unquestionably excellent" and "superior in all regards;" Kochan could not "speak highly enough about the research work that Haynes has done." (App-611). During this meeting, Alexander "emphasize[d]" to Brush that "we need to be able to do the 'tough' thing sometimes (meaning vote no)." (App-601).

*c. When more external reviewers were necessary, Chair Brush suggested external reviewers with known negative reputations.*

Multiple reviewers declined to serve as external reviewers for Haynes because they were unfamiliar with his field, and because an overlap between Cho's and Haynes's external reviewers, additional reviewers were needed.[1]*See* App. 455-56. Brush suggested at least two external reviewers who were *known* to be negative: (1) Andrew Gibbons; and (2) Patricia Hardré. (App-888). Brush admitted: "Funny, I always thought [Gibbons] was kind of critical. He was a 'stay away' person." (App-632). Similarly, according to Boling, Hardré had a negative reputation:

---

[1] SOE insinuated the nine declines should be considered a negative against Haynes when, in fact, multiple reviewers felt unqualified to judge Haynes's work or were out of the country. (App-1726).

> The terriblest [sic] letter [for Haynes] is from Pat Hardre . . . . I recommended against her for Yonjoo because this is the way Pat writes—incredibly harsh and repetitively so; also somewhat unprofessionally if you ask me.

(App-629). Boling (Cho's mentor) specifically removed Hardré from her list of external reviewers because of Hardré's negative reputation. (App-629; App-888; App-1888 at 114-15). Haynes had no reason to believe any of Chair Brush's recommendations for external reviewers were unqualified or otherwise ill advised. (App-2192-93 at 86-89).

### III.E.6.  All other external reviews endorsed Haynes.

Hardré—Haynes's only critic—was admittedly not a leader in Haynes's "very specialized subfield" of HRD (App-612), yet her external review—the only negative external review (*see* App-608-24)—was heavily relied on at all levels of review. (App-568-98). Nonetheless, Hardré's review was an extreme outlier, as indisputably every other external reviewer thought Haynes exceeded the standards necessary for attaining tenure. (App-608-11; App-615-24). Haynes's other external reviewers concluded as follows:

**Dr. Frances Kochan,** *former Dean of the College of Education and Professor at Auburn University* (in-field reviewer): "I cannot speak highly enough about the research work that Haynes has done. The quantity and quality of work are extraordinary; the breadth of the work is extensive; the importance of the work is without question." (App-611).

**Dr. Robert Branch,** *Professor and Department Head of Department of Career and Information Studies at University of Georgia* (out-of-field reviewer): "Haynes' record of publications and presentations at scholarly forums in educational technology would be considered above average for a peer faculty member at most universities with which I am familiar. However, his scholarship in the area of human resources development exceeds expectations is [sic] should be regarded as exemplary." (App-616). "Overall, Haynes has demonstrated an ability to teach, conduct research, advise students, develop program curricula, and provide service to the university and community. Haynes would have my enthusiastic support for tenure and promotion to the rank of Associate Professor if he were at the University of Georgia." *Id.*

**Dr. Tonette Rocco,** *Professor at Florida International University* (in-field reviewer): "He is lead author on the majority of his publications," and his record and "in progress" work is what should be expected of a faculty member moving from an assistant to an associate

rank." (App-617). "[H]is work is destined to have an impact on the fields of education, HRD, and management because so few scholars look at cross cultural mentoring, the concerns of American minorities, or the issues of mentoring in other countries." (App-618).

**Dr. Andrew Gibbons,** *Professor at Brigham Young University* (out-of-field reviewer): "Given my limited knowledge of HRD literature, I believe Haynes has placed his work in a variety of reputable sources. The tone of his writing is professional, and I found the work to be relevant." (App-620). "[A] person with Haynes' performance would receive tenure with rank advancement at schools comparable to Indiana University." *Id.*

**Dr. Fredrick Nafukho,** *Professor and Department Head of Educational Administration and Human Resource Development at Texas A&M University* (in-field reviewer): ". . . I am familiar with Haynes' scholarly work and have met him at the Academy of Human Resource Development . . . . I can state without reservation that his work is positively impacting the fields of human resource development, management and higher education." (App-622). ". . . Haynes has identified a research focus that is critical to the success of the fields of HRD and Management . . . . Compared to his peers in the field of HRD . . . , his scholarly record is above average and in my opinion, he would be promoted to the rank of Associate Professor with tenure in my own institution." (App-623).

### III.E.7.   The IST Department tenure vote favored Haynes.

At a meeting on September 6, 2013, the IST Department—whose faculty were more familiar with Haynes's specific field than anyone else at SOE or IU—voted in favor of Haynes's request for tenure. (App-567). The vote was four in favor and two against, but a unanimous vote was not required. *Id. See* App-741-42.

Missing from the summary of the meeting was the Department's discussion of Hardré's "unprofessional" external review, including how she "tended toward hyperbole" and "really didn't know Ray's area of specialization," leading to a "suggestion to ignore or downplay this letter." *Compare* App-916 and App-2089-90 at 79-81 *with* App-569-71. Multiple members of the Department dismissed this letter (App-2089-90 at 79-81; App-1857 at 105; App-1895 at 142), but this dismissal of Hardré's review was omitted from the Department's ultimate report. *See* App-569-71.

Before the tenure vote meeting, Ottenbreit-Leftwich compiled the scores of Haynes's teaching evaluations incorrectly. The average for this class was therefore 3.35, not "2.6." (App-2345-46¶25; App-917). Ottenbreit-Leftwich therefore made a substantial misstatement of Haynes's teaching evaluations.

In October 2013, Alexander asked the IST Department to rewrite its summary for Haynes and directed Brush to write this summary. (App-645). The second summary written by Brush was significantly altered in content and tone from the initial report. *Compare* App-567 *with* App-569-71.[2] Although this summary was written by Brush, it stated it was written by DiSilvestro. (App-569-71; App-904-905; App-2078 at 33-35). In the years prior to Haynes's application for tenure, department memos were short. (App-1343). *See, e.g.*, App-567; App-910; App-0952. Alexander changed the way that student-solicited letters were collected—instead of seeking letters only from former students who completed the program, all current and former students were solicited. (App-2333 at 61-64; App-918).

### III.E.8. Brush, Haynes's Department Chair, provided a tepid vote in favor of Haynes but withheld crucial information from Haynes.

In a September 15, 2013, recommendation to Dean Gonzalez, Brush technically voted in favor of Haynes, but it was tenuous support. (App-577-78; App-2456-62). For instance, although 5 of 6 external letters were favorable to Haynes, Brush understated the number as only "[a] majority" of favorable external reviews. (App-2458; App-2461).

---

[2] SOE provided no evidence Bichelmeyer ever approved the revised summary. The evidence shows otherwise—Brush specifically told Alexander that "everyone except Barb" approved of the final summary. (App-1722).

Similarly, Brush presented a skewed version of Haynes's teaching evaluations. *Compare* App-2459-60 *with* App-2345-46¶¶24-25.

In a follow-up meeting on September 17, 2013, Brush told Haynes that he had a strong case for tenure, and his external reviews were good. (App-2343¶21). Brush further told Haynes that he should not have any issues in subsequent levels of review. *Id.* Brush failed to disclose the existence of the negative external review by Hardré or the perspective of the IST Department faculty on Hardré's letter. (App-2343¶21; App-2229 at 236).

Notably, Brush spoke positively to Haynes in person but, behind his back, Brush impugned Haynes to IST Department colleagues, including Boling, Glazewski, and Bichelmeyer; this also included communicating directly with at least one potential external reviewer. (App-2343-47¶29). *See, e.g.*, App-794 ("Does he read the shit he writes? This is why he is having trouble with tenure. He can't communicate with anyone."). *See also* App-601-604, App-632-33, App-664-66, App-705, App-710, App-771, App-774, App-781, App-797, App-856-67, App-892.

### III.E.9. Glazewski, Brush's protégé, controlled and manipulated the SOE Promotion and Tenure Committee report against Haynes.

Krista Glazewski, Brush's main protégé, former student, and close friend, presented Haynes's case to the SOE Promotion and Tenure Committee ("PTC"). (App-2025 at 149; App-2199 at 116-17). Glazewski and "several committee members" admittedly had no knowledge of Haynes's field of specialization, HRD. (App-638; App-587). Nonetheless, the SOE PTC, under the heavy influence of Glazewski, ultimately rejected the IST Department's vote and voted against Haynes's application for tenure on or around October 22, 2013. (App-587).

Glazewski, the "first reader and principal writer" of the PTC report, torpedoed Haynes's application for tenure before the PTC ever met. (App-579-87; App-3379; App-1699-1718). A draft report by Glazewski was circulated on October 2, 2013—before the Committee's first meeting on October 3, 2013. (App-630-31; App-1720). Glazewski fundamentally altered the initial draft of the PTC's report, changing the vast majority of its positive statements to negative or neutral statements. (App-1699-1718). *See, e.g.*, App-1712-14 (changing "comparable" to "strong;" changing number of external reviews that "strongly endorsed" Haynes from "Four" to "Two;" removing "high quality" before publications; changing reviewers with negative assessments of Haynes from "One" to "Three;" changing "commended" to "recognized;" removed the word "strong" before "record;" and adding negative assessment of Nafukho letter as well as teaching).

The PTC report manipulated a quotation from an external reviewer from what was actually a positive statement by an external reviewer into a negative statement. *Compare* App-582-83 (claiming reviewer only said Haynes was "above average") *with* App-616 ("[Haynes's] scholarship in the area of human resources development exceeds expectations is [sic] should be regarded as exemplary.").

### III.E.10. Based on Alexander's analysis, Dean Gonzalez recommended against tenure based on this same erroneous information.

Haynes had no notice of any significant issues or concerns with his application for tenure until December 10, 2013, when then-Dean Gerardo Gonzalez orally informed Haynes of his recommendation against Haynes's application for tenure. (App-755). The decision to deny tenure was initially reached by Alexander, who had been guiding the process, on November 18, 2013; Alexander drafted the letter from Gonzalez to Haynes on

November 20, 2013. (App-652-56). Gonzalez accepted Alexander's recommendation on November 26, 2013. (App-752).

Three weeks after the letter's date of November 20, 2013, Haynes received the letter Gonzalez sent to Provost Lauren Robel providing further details of Gonzalez's decision not to recommend tenure. (App-588-90). Gonzalez's report contained inaccuracies and misrepresentations of Haynes's record. (App-588-90). For instance, despite the five positive external reviews, Gonzalez focused on the singular negative review by Hardré as if it were all-encompassing judgment on the quality of publications, although it was written by one external reviewer with an unprofessional and negative reputation and who was not an in-field reviewer. *See, e.g.*, App-588 ("Hardré notes specifically that [the journals] are not the most elite, selective, or prestigious outlets;" "Hardré notes that Haynes' work may be 'illuminating,' but it is not clear how truly substantive").

### III.E.11. Vice Provost Gieryn and campus Tenure Advisory Committee voted against Haynes and relied on erroneous and incomplete information provided by previous levels of review.

By a report dated March 1, 2014, the campus Tenure Advisory Committee ("TAC"), headed by then-Vice Provost for Faculty and Academic Affairs Thomas Gieryn, voted against Haynes's application for tenure, relying on erroneous and incomplete information supplied at lower levels of review. (App-591-98). For instance, the PTC report and Gieryn's report manipulated the context of an external reviewer to conclude that Haynes's research was only "above average," as opposed to "exemplary." *Compare* App-594 and App-598 *with* App-616 ("Haynes' record . . . in educational technology would be considered *above average* for a peer faculty member at most universities;" but "his scholarship in the area of human

resources development exceeds expectations is [sic] should be regarded as *exemplary*.")
(emphasis added).

### III.E.12. Subsequent decisions by Provost Robel, the Faculty Board of Review, and President McRobbie decisions were based on the same erroneous and incomplete information.

Haynes was informed of Provost Robel's decision not to reappoint and to deny tenure and promotion by a March 26, 2014, letter from Vice Provost Gieryn, which Haynes did not receive until April 9, 2014. (App-538; App-2352). On May 27, 2014, Haynes initiated a grievance with the IU Faculty Board of Review ("FBR") against Gieryn, Gonzalez, Alexander, and Brush. (App-2485-2631). Relying on information supplied by Gieryn, the FBR recommended that Robel sustain the denial of tenure on August 6, 2014. (App-1385-88; App-1395-1401). On September 22, 2014, Haynes was notified that Robel accepted the FBR's recommendations and would take no further action. (App-1365).

Haynes requested a review of the FBR decision by IU President McRobbie on March 17, 2015, and included new information received through a FOIA request by Haynes between October 2014 and March 2015. (App-1432-34; App-1440-88). This information was unavailable during Haynes's tenure application or his grievance to the FBR. *Id.*

In this appeal to McRobbie, Haynes complained, for the first time, that he had been discriminated against because of his race. (App-1424). Without further investigation or inquiry, McRobbie told Haynes on March 23, 2015 that no further action would be taken by his office or the Board of Trustees. (App-1354). This was SOE's final decision. (App-1354).

### III.E.13. Cho and Ottenbreit-Leftwich, who were not African-Americans, received unanimous votes for tenure, even though concerns were raised with each application.

*a. Cho was less independent than Haynes and had issues with her teaching evaluations, but each issue was overlooked at every level of review.*

Cho had more publications than Haynes, but many of her publications were "focused on summarizing research of other scholars and promoting 'models' that lacked much empirical foundation." (App-909). Moreover, despite negative teaching evaluations and other concerns related to Cho's teaching and advising, these were glossed over at all levels of review. *Compare* App-791 *and* App-1978 at 190-91 *with* App-908-909. Yet, she received a unanimous vote for tenure at all levels. (App-2786-87; App-2022 at 37; App-3407). It appeared that there was a "[d]ifferential weighting of concerns for [Haynes and Cho]," which "raises questions about the fairness of the process." (App-2786-87).

*b. Ottenbreit-Leftwichwas dependent on her mentors and colleagues for her research and grant funding.*

Out of Ottenbreit-Leftwich's 16 total publications listed on her dossier presented for tenure (including peer-reviewed and non-peer reviewed materials), only 4 were (a) independent of her mentors at SOE or Purdue University; and (b) were 40% or more based on her work. (App-1014-21). One of Ottenbreit-Leftwich's external reviewers "found [her]self wondering whether (and to what extent) [Ottenbreit-Leftwich's] thinking was influenced by one or more of her co-authors . . . ." (App-984). Specifically, "few of her publications to date are singly authored," so "it is difficult to determine whether Leftwich's facility with collaborative research and writing with both faculty and students overshadows her unique individual contributions to educational technology research." *Id.* Moreover,

Leftwich's "research agenda" was "aligned with the perspectives of the majority of educational technology presenters at present." (App-3696). *See also* App-2788-89.

Of the nine funded grants listed by Ottenbreit-Leftwich in her dossier, six grants were sought with or through her mentors at SOE or Purdue University. When she applied for tenure, Ottenbreit-Leftwich had "not served as the lead PI on major funded projects." (App-978). All funded grants while Ottenbreit-Leftwich was at SOE were with Brush or Glazewski. (App-1070). *See also* App-2789.

Despite these concerns, Ottenbreit-Leftwich received a unanimous vote at all levels. (App-930). Brush spent much of his Chair's memorandum dispelling the issues identified. (App-945-46). Haynes's "research record [was] at least comparable to that of [Ottenbriet-Leftwich];" and if Ottenbriet-Leftwich's record "demonstrated 'excellence' in research, then so does the record of [Haynes]." (App-2787-90).

## IV. SUMMARY OF THE ARGUMENT

Extending its more than 100-year streak of failing to ever grant tenure to an African-American male in the School of Education, IU denied Haynes's tenure application and terminated his employment. Despite an excellent annual review only months before his tenure application and at least a comparably excellent research record to a white female who was granted tenure the year before as well as external reviewers who stated Haynes was "unquestionably excellent" and "superior in all regards;" Kochan could not "speak highly enough about the research work that Haynes has done." (App-611)," SOE reached a "pre-determined" result in an atmosphere that drastically increased "the likelihood that implicit

22

attitudes and stereotypes associated with [Haynes's] race or ethnicity [would] influence judgments made of [Haynes]." (App-2793; App-2885-86¶31).

The second command in the IU SOE, Executive Associate Dean Joyce Alexander, instructed Brush—the head of Haynes's department—to "vote no" on Haynes's application for tenure. Moreover, Brush recommended two external reviewers to Haynes even though these external reviewers were known to be negative. One of these external reviewers had even been excluded from another tenure applicant's review because of this negative reputation. These were just a few of the defects and violations of university policy during Haynes's tenure review. All told, no fewer than 15 violations of SOE's own tenure policies and practices occurred during the review of Haynes's tenure application.

The district court ignored and misrepresented much of the evidence showing that the decision to deny Haynes tenure was based on his race, even misrepresenting the text contained in an email, and excluded both of his experts' opinions, although both of these opinions were relevant and helpful to the factfinders in multiple ways. The district court made an improper credibility determination about Haynes's intent related to equitable tolling. This Court should therefore reverse the district court's rulings granting summary judgment in favor of SOE on Haynes's race discrimination claims because the district court excluded relevant, material expert opinions, made all factual inferences in favor of SOE, ignored significant circumstantial and indirect evidence of pretext, and made a credibility determination on the issue of equitable tolling. Haynes has come forth with substantial evidence that raises genuine issues of fact as to Haynes's discrimination claims.

## V.    LEGAL ARGUMENT

### V.A.    STANDARD OF REVIEW

#### V.A.1.    Motion for Summary Judgment

This Court reviews the district court's grant of summary judgment *de novo*, "construing all relevant facts and inferences in favor of nonmoving party." *Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772, 779 (7th Cir. 2013) (citation omitted).

Haynes is entitled to "the benefit of conflicts in the evidence and any reasonable inferences in [his] favor." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 700 (7th Cir. 2013). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097, 2102 (2000). *See Bamcor LLC v. Jupiter Aluminum Corp.*, 767 F. Supp. 2d 959, 966 (N.D. Ind. 2011) (finding the summary judgment standard mirrors the directed verdict standard under which "the trial judge must direct a verdict if . . . there can be but one reasonable conclusion as to the verdict." (quoting *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986))).

#### V.A.2.    Motion to Strike experts

##### a.    *Motions to strike in the summary judgment process are specifically disfavored.*

In the Southern District of Indiana, "Local Rule 56-1(i) specifically disfavors motions to strike in the summary judgment process." *Truitt v. Indianapolis Hous. Agency*, No. 1:11-cv-1227-JMS-MJD, 2012 U.S. Dist. LEXIS 179300, at *1 n.1 (S.D. Ind. Dec. 19, 2012). Thus, on summary judgment motions, courts have "endeavored to consider the admissible portions of [a challenged] affidavit while disregarding the inadmissible portions." *Williams v. Lovchik*, 830 F. Supp. 2d 604, 623 (S.D. Ind. 2011) (citing L.R. 56.1(i)).

24

> *b. This Court reviews de novo whether the district court applied the proper framework and reviews whether the decision to exclude was an abuse of discretion.*

This Court "review[s] *de novo* whether a district court followed the proper framework for evaluating expert testimony, and if it did," reviews "its decision to admit or exclude expert testimony for an abuse of discretion." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 805 (7th Cir. 2013) (citation omitted).

### V.A.3.  Tenure Decisions

Although "'practical considerations make a challenge to the denial of tenure at the college or university level an uphill fight,' . . . tenure decisions 'should not be permitted to camouflage discrimination, even the unconscious discrimination of well-meaning and established scholars.'" *Namenwirth v. Bd. of Regents of Univ. of Wisc. Sys.*, 769 F.2d 1235, 1243 (7th Cir. 1985).

**V.B.      BECAUSE PERNA'S TIMELY TESTIMONY WAS RELEVANT AND DIRECTLY HELPFUL TO THE TRIER OF FACT, THE DISTRICT COURT SHOULD HAVE CONSIDERED HER OPINIONS.[3]**

**V.B.1.      In an abuse of discretion, the district court excluded Perna's expert testimony, though it was timely, based on relevance and a lack assistance to the factfinder.**

"Expert testimony is permitted to assist the trier of fact with technical issues that laypeople would have difficulty resolving on their own." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d

---

[3] Under Local Rule 56-1(i), "Any dispute over the admissibility or effect of evidence **must** be raised through an objection within a party's brief." (emphasis added). Nonetheless, SOE filed a separate motion to strike Perna's testimony. (App-2632-49). This motion thus should have been denied on its face, but the district court ignored the motion's procedural impropriety, claiming SOE "adequately raised [its] objection in [its] reply brief and filed [its] Motion to Strike on the same day." (App-3412). SOE, however, failed to raise the objection in any substantive way; only conclusory statements were provided. *See* App-2657; App-2661. The decision to consider this improper motion to strike was an abuse of discretion.

753, 765 (7th Cir. 2013) (citing Fed. R. Evid. 702(b)-(d)). Under the "liberal relevance standard" contained in Fed.R.Evid. 401, "testimony is relevant as long as it 'has any tendency to make a fact more or less probable' than it would otherwise be." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013) (quoting Fed. R. Evid. 401; citing Fed. R. Evid. 702). Notably, "even brief expert reports **will suffice at the summary judgment stage**." *Patton v. MFS/Sun Life Fin. Distribs.*, 480 F.3d 478, 486-87 (7th Cir. 2007) (citation omitted) (emphasis added).

Because Perna's declaration, which was timely submitted, was both helpful to the factfinder and relevant to pretext as well as SOE's qualified immunity defense, the district court's decision to exclude Perna's expert testimony was an abuse of discretion.

### V.B.2. Perna was well-qualified to offer expert opinions on best practices for tenure review processes.

Conclusions of experts "without more, may be supportable based on [the expert's] *extensive and specialized experience*." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893-99 (7th Cir. 2011) (citation omitted) (emphasis added). In fact, "no one denies that an expert might draw a conclusion from a set of observations based on extensive specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). *See, e.g., Smith v. I-Flow Corp.*, 2011 U.S. Dist. LEXIS 47197, at *18-19 (N.D. Ill. May 3, 2011) (finding that expert's testimony regarding compliance with FDA regulations was admissible).

Like the expert in *Smith* who had extensive experience in her field, Perna has extensive specialized knowledge in the field of tenure reviews. Perna would be serving as an expert equivalent to an expert in the area of human resources, who testifies about whether certain actions by an employer were "against [or consistent with] industry standards," which

"is proper expert testimony because [the expert] has knowledge of those industry standards that the jury does not." *Castrillon v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 2015 U.S. Dist. LEXIS 69530, at *11-12 (S.D. Ind. May 29, 2015). *See also Kennedy v. United States Postal Serv.*, 2013 U.S. Dist. LEXIS 41904 * (N.D. Ind. Mar. 25, 2013).

Perna is well-qualified to assess qualifications for tenure as well as the fairness of the process for tenure reviews, especially as they relate to minority faculty members. Perna established her qualifications on tenure reviews in both her declaration and expert report, including but not limited to:

a) Holding positions during her time at the University of Pennsylvania that involve working on faculty issues.

b) Possessing knowledge about schools of education generally, including holding Bachelor's degrees in Economics and Psychology from the University of Pennsylvania, as well as a Master's in Public Policy and a Ph.D. in Education from the University of Michigan; previously serving in leadership positions in the primary national associations in the field of higher education administration; and serving on editorial boards of leading journals.

c) Providing invited testimony before the U.S. Senate's Health Education Labor and Pensions Committee and the Subcommittee on Higher Education and Workforce Training, Committee on Education and the Workforce, United States House of Representatives.

d) Most significantly, Perna has participated in or consulted on more than 50 tenure reviews at multiple universities.

(App-2356-57; App-2771-73).

Perna has written multiple peer-reviewed articles on tenure and promotion. Perna's research has been featured in prominent national news outlets. (App-2358; App-2773). Perna has contributed numerous publications and made presentations on tenure. (App-2369-2411;

App-2800-42). Perna has extensive knowledge and experience gleaned through national, peer-reviewed research and presentations on tenure reviews. Perna's research is highly respected and valued in her field.

From her extensive knowledge and research on tenure reviews, Perna reviewed Haynes's tenure review at SOE and discovered multiple deficiencies in the tenure review process as well as comparing recent IST Department faculty who had been given tenure to Haynes.

### V.B.3. In excluding Perna's opinion comparing Haynes's research with another recent IST Department tenure candidate, the district court ignored Perna's analysis as well as the criteria used by all voters in Haynes's tenure review process.

The district court excluded Perna's expert opinions comparing Haynes to other IST Department faculty who were given tenure because Perna "readily admits in her declaration that she is 'not an expert in [Haynes's] content area,' which might explain why Perna compares the quantity, rather than the qualify, of the research done by both Haynes and [Ottenbreit-Leftwich]." (App-3414). In these findings, the district court wholly ignored Perna's qualifications to speak on tenure processes and decisions generally, which are numerous (*see* supra V.B.2.b; App-2356-58; App-2771-73), and ignored how tenure review processes work at universities.

Perna never intended to speak as an expert on the quality of the text within Haynes's publications because she was not an expert in Haynes's specialty. *See* App-2356; App-2786. Faculty reviewing a tenure candidate's application are generally unfamiliar with that candidate's specialty. Haynes's own IST Department was largely unfamiliar with his field. None of the decisionmakers in Haynes's tenure review specialized in Haynes's field of

specialty, aside from one IST Department faculty member—Bichelmeyer. (App-1834 at 14-15; App-462-64).

The district court further found Perna "offers no substantive analysis in her review of either candidate's work and makes the assumption that the two candidates were equally qualified based on the number of works generated, despite [Perna's] own acknowledgment that the University has emphasized '[q]uality of production is considered more important than mere quantity.'" (App-3414). The district court ignored that all levels of review focused on the objective measures that were examined by Perna, including the number of peer-reviewed articles, the ranking of the journals Haynes published in, the awards given to Haynes, and his grant money. *E.g.*, App-570-71 (noting Haynes's publications were not "in very high-ranking journals;" discussing the "volume of Haynes' publication record;" noting "an average [per year] of just over one refereed journal article since 2006"); App-583-84 (considering number of peer-reviewed publications, the number of authors in Haynes's publications, Haynes's amount of grant money, and the impact rating of Haynes's journals); App-588-89 (noting "a low number of peer-reviewed publications (8 in total) and most of them lower tier venues," Haynes's not publishing in "the most elite, selective or prestigious outlets;" and "just over one refereed journal article a year"); App-592-93 (examining number of articles in peer-reviewed journals, number of authors in articles, and impact ratings).

Accordingly, Perna examined the same data that each of Haynes's voters examined during Haynes's tenure review. If other faculty were evaluating Haynes on the basis of objective factors in his research record, it is both helpful and informative for Perna to examine these areas and provide meaningful comparisons to other recent tenure candidates

who received tenure. This analysis was not a simple counting exercise, as the district court claimed. These numbers provide a deeper yet objective analysis of other tenure candidates, based on Perna's knowledge and experience of tenure reviews. (App-2358-60; App-2772-73; App-2786). In her full expert report, Perna explicitly examined SOE's own tenure criteria in comparing the tenure candidates to each other; these were objective measures chosen by SOE to evaluate its tenure candidates. (App-2787-91).

### V.B.4. The defects identified by Perna in SOE's assignment of external reviewers as well as other missteps in the tenure review process were identified through her vast experience in tenure reviews.

As to the selection of external reviewers and other defects, the district court found that Perna's testimony was irrelevant and "fail[ed] to draw on any 'specialized knowledge' that would be useful to the trier of fact" in that Perna used "none of [her experience in participating in approximately 100 tenure reviews at multiple universities] in reach her conclusions and contribute[d] nothing new to the analysis." (App-3415).

Nonetheless, the issues identified by Perna related to the selection of external reviewers as well as the other defects, which were gleaned from her participation in and research on tenure reviews. (App-2772-73; App-2777-86). The average factfinder does not have Perna's extensive knowledge, research, and experience in tenure reviews.

### V.C. THE DISTRICT COURT'S EXCLUSION OF HAYNES'S EXPERT TESTIMONY WAS WITHOUT CAUSE. BOTH EXPERTS PROVIDED TIMELY, RELEVANT, AND HELPFUL TESTIMONY ON MATERIAL ISSUES.

### V.C.1. Perna's expert report responded to SOE's objections to her initial declaration as well as IU's new arguments raised in its Reply.

SOE moved to exclude Perna's initial declaration in its entirety, based on objections related to admissibility under *Daubert*, relevancy, and reliability. (App-2637-48). Perna's full

30

expert report more fully provided her qualifications and bases for her opinions. (App-2772-73). Perna's statements were augmented in her full expert report, but Perna's ultimate conclusions remained the same. *See* App-2791-92.

The district court excluded Perna's full report as part of the supplemental evidence submitted with her Surreply because Haynes did not "actually address the objections to the declaration themselves," Haynes was trying a "backdoor attempt to admit his expert's testimony" that "contravene[d] the purpose of Local Rule 56-1(d)." (App-3183).

Although Perna's expert report was a more complete statement of her opinions from her initial declaration, as opposed to a point by point refutation of SOE's objections, this expert report was still evidence submitted in response to SOE's objections to the admissibility of Perna's declaration. It is not uncommon to allow a supplemental declaration from an expert to address objections to his testimony. *See, e.g.*, *Rednour v. Wayne Twp.*, 51 F. Supp. 3d 799, 809 n.13 (S.D. Ind. 2014) (finding expert's supplemental declaration, which "directly addresses Plaintiff's arguments concerning his qualifications to speak as an expert witness" and thus was "admissible"). The Southern District of Indiana's Local Rule 56-1(d) does not restrict a nonmovant to a point-by-point refutation of issues raised in the reply. *See* L.R. 56-1(d).

Perna's full expert opinion was proper to submit with Haynes's Surreply. If Haynes's motion to supplement was properly denied, the district court should only have stricken those opinions which fell outside of a direct response to SOE's objections and new arguments in its Reply, not Perna's entire opinion. As a result, it was an abuse of discretion to exclude Perna's full expert report.

**V.C.2. Haynes submitted his expert reports with his Surreply (and later Motion to Supplement) instead of his Response because of an extremely constricted briefing timeline.**

Though the July 31, 2017, Order concluded, "[i]f Haynes wished to utilize the expert reports in his response brief, he should have petitioned the Court for more time for his experts to complete the reports prior to the deadline for his response brief" (App-3184), Haynes believed that seeking an extension was impermissible based on the district court's April 2017 Order that specifically required that summary judgment briefing be completed by May 26, 2017. (App-449¶3). Haynes had less than two weeks from his receipt of the final deposition transcript on April 24, 2017 until his response deadline of May 5, 2017 (later extended to May 7, 2017). By April 24, 2017, Haynes's experts were inundated with their end-of-semester responsibilities and had minimal time to examine six depositions totaling nearly 900 pages before finalizing their reports.

The district court concluded that, Haynes should have "take[n] the 'it's easier to ask forgiveness than permission' approach," and "informed the Court, and the Defendants, of the need for more time to gather his expert testimony so that the issue could be addressed in a timely manner, but he failed to do so." (App-3419). This contradicted the district court's earlier statement that "[t]he parties should not expect to receive extensions of their deadlines for briefing Defendants' motion for summary judgment that would threaten the ability to have that motion fully briefed by May 26, 2017." (App-449¶3). It was therefore unclear and unstated how Haynes should have anticipated any extension was possible.

Haynes suffered enormous prejudice from the exclusion of this information because it was impossible for the experts to complete their review of six depositions totaling 900

pages before Haynes filed his Response. Perna hurriedly provided a summary declaration on summary judgment, whereas Greenwald was unable to submit any information for Haynes's Response. This was an unfair and inequitable prejudice to Haynes because SOE was permitted to submit new arguments and several new exhibits with its Reply; but, Haynes was restricted in submitting evidence and a response to SOE's (the moving party's) evidence on a dispositive motion.

### V.C.3. Each expert offered expert testimony relevant to material issues in the case, including pretext and SOE's assertion of the same actor influence.

#### a. *Greenwald offered critical testimony on pretext and the same actor influence.*

Greenwald's report provided evidence of pretext as well as a reproach of SOE's invocation of the same-actor inference. *See* App-64 (suggesting because Brush supposedly "supported the hiring of Haynes," and wrote a report as chair in favor of Haynes, these facts "conclusively undermine any inference that Brush harbors prejudice against African Americans"). *C.f.* App-2890 ("Implicit biases are pervasive and are often observed in more than 70% of Americans, most of whom sincerely regard themselves as (non-prejudiced) egalitarians . . . . Implicit bias may play a role in ingroup favoritism, which can produce unintended discrimination, which in Haynes's case could take the form of selective (non)beneficence toward a racially dissimilar colleague.").

Greenwald's testimony included that in subjective decisions such as tenure reviews, "implicit biases can constitute a substantial cause of disparate treatment in employment even when other non-discriminatory factors also contribute causally to the employment related decision." (App-2875¶15). Moreover, at SOE, a statistical analysis would likely show a

33

disparate impact for male African-American. (App-2887-88¶36). Haynes was "disadvantaged" by the lack of help "in his progress to tenure, and was a likely consequence of unrecognized ingroup favoritism." (App-2887¶34). Greenwald further found Hardré's external review "contain[ed] multiple gratuitously demeaning remarks," that were "simply inappropriate for appearance in a document for this purpose" but lacked "a description or critique of Haynes's scholarly work." (App-2888-39¶38). Finally, Greenwald found that Brush's disparaging remarks about Haynes "ordinarily have persuasive effect" against Haynes, and Brush showed "some animosity and impatience with Haynes . . . ." (App-2889-90¶39).

>   b.   *Perna similarly offered relevant and material expert testimony on pretext and the same actor inference.*

In preventing Haynes from submitting Perna's full expert report, Perna was prohibited from further expounding on her earlier analysis, which provided evidence of pretext and the same actor inference. Perna found, for instance, that Haynes's receiving the exemplary annual review shortly before his tenure review, in which he did not receive an exemplary rating "suggests a significant miscommunication about expectations for tenure and promotion and a lack of mentoring and fairness in the tenure review process for Haynes." (App-2778). Perna found it was "improper for Dean Alexander, who was supposed to be neutral during the tenure process, to misrepresent the content of external reviews as well as recommend against tenure before faculty had an opportunity to independently review the external letters and form their own opinion." (App-2779-80). It was similarly "improper for the chair of a department to recommend an external reviewer with a reputation for writing unprofessional reviews." (App-2786). Perna, furthermore,

raised multiple, significant issues related to the fairness of the process used in Haynes's

tenure review. (App-2778-92).

Ultimately, Perna concluded:

Because of the irregularities and negative biases in the tenure and promotion process that are noted in this report, Haynes' record did not receive a fair and substantive evaluation on its academic merits. Instead, the tenure and promotion process for Haynes was executed in a way that seemingly pre-determined the result to deny tenure to Haynes.
(App-2792-93).

The supplemental opinions by Greenwald and Perna were relevant and material to

Haynes's response to SOE's *Motion for Summary Judgment*—especially pretext and the same

actor inference. Because of the tight timeline imposed for Haynes to respond to *Defendants'*

*Motion for Summary Judgment*, it was an abuse of discretion for the district court to deny

Haynes's motion to supplement.

> **V.C.4.** **At a minimum, each expert offered expert testimony that was relevant to material issues raised in SOE's Reply, including SOE's assertion of qualified immunity.**
>
> a. *The district court misconstrued the exceptions to qualified immunity as solely requiring a known constitutional violation.*

As an initial matter, as part of the reason for excluding Perna's expert testimony, the

district court found that Perna's opinions "do not relate to whether or not any of the

individual Defendants knowingly violated Haynes' constitutional rights." (App-3417).

The qualified immunity doctrine, however, "shields government officials who

perform discretionary functions from liability for civil damages 'insofar as their conduct does

not violate clearly established **statutory or constitutional rights** of which a reasonable

person would have known.'" *Silk v. City of Chi.*, No. 95 C 0143, 1996 U.S. Dist. LEXIS 8334,

35

at *98-99 (N.D. Ill. June 4, 1996) (quoting *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175-76 (7th Cir. 1994)). Thus, Perna's opinion are relevant not only if it related to evidence that SOE knowingly violated Haynes's constitutional but also whether SOE knowingly violated Haynes's federal statutory rights (and SOE was plainly incompetent in violating Haynes's constitutional *or* federal statutory rights). *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (Qualified immunity cannot protect the "plainly incompetent" or the "knowingly violat[ive of] the law.").

> b. *Perna's opinions were relevant to SOE's qualified immunity defense.*

Perna's testimony was relevant to SOE's qualified immunity defense, as her testimony provided evidence that each of the individual Defendants-Appellees worked to systematically and systemically sabotage Haynes' tenure application in egregious ways violative of SOE's own written policies, procedures, and practices as well as violative of norms in academia. Indeed, Perna stated in her expert opinion:

> The defects and irregularities in the process for Haynes **strongly suggest** that the denial of tenure for Haynes was the **result of more than just a differing judgment or differing discretion by faculty members** . . . . Because of the irregularities and negative biases in the tenure and promotion process . . . , **Haynes' record did not receive a fair and substantive evaluation on its academic merits. Instead, the tenure and promotion process for Haynes was executed in a way that seemingly pre-determined the result to deny tenure to Haynes.**

(App-2791-93) (emphasis added).

Perna's expert testimony provides evidence that SOE was acting intentionally, or at least incompetently, in denying Haynes's application for tenure. If the reasons for the denial of Haynes's tenure application were blatantly false and racially discriminatory, this was far outside a discretionary judgment of faculty but was plainly academic fraud and racially

discriminatory against Haynes. Perna further offered evidence that during Haynes's tenure review, the individual Defendants-Appellees each violated the norms for academia in tenure reviews, despite known issues of inclusion and advancement for minority faculty at SOE. (App-2774-86). *See also* App-3198-3203.

      *c.   Greenwald's testimony was also relevant to the issue of qualified immunity.*

The district court excluded Greenwald's opinion as irrelevant to the issue of qualified immunity concluding because "[i]f anything, this type of [implicit] bias would be protected under the qualified immunity doctrine, which gives government officials breathing room to make reasonable yet mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." (App-3417-18) (quotation omitted). This statement, however, appears to be contradicted by recent a Supreme Court opinion.

The Supreme Court has apparently considered "potential bias" as relevant to qualified immunity. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). In *Tolan v. Cotton*, the Supreme Court reversed a grant of summary judgment by the Fifth Circuit based on a qualified immunity defense because the Fifth Circuit "fail[ed] to credit evidence that contradicted some of its key factual conclusions;" thus, "the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party." *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson*, 477 U.S., at 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202).

The Fifth Circuit had concluded qualified immunity applied, but the Supreme Court found that some of the "key evidence" from the nonmovant was ignored. *Id.* For example, witnesses of the nonmovant had offered their own contradictions of the police officer's perceptions of the situation that contradicted the assertion that an officer's actions were

reasonable. The Supreme Court found that "[t]he witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases," and "reasonable inferences [relating to these witnesses' perceptions, recollections, and potential biases] should be drawn in favor of the nonmoving party." *Tolan v. Cotton*, 134 S. Ct. 1861, 1867-68 (2014) (emphasis added).

The Supreme Court granted leave for the NAACP to file an amicus brief, in which it directly discussed implicit bias as a factor weighing against qualified immunity:

> Here, Sergeant Cotton's evaluation of the scene, prompting the use of lethal force in asserted self-defense, may have been shaped by the implicit biases just described . . . . Rather than subject this claim to careful analysis or admit the possibility that Sergeant Cotton was unreasonably mistaken, [the panel rejected the plaintiff's evidence]. . . .

*See* Motion for Leave to File Brief Amicus Curiae and Brief of the NAACP Legal Defense & Educational Fund, Inc., as Amicus Curiae in Support of Petitioner, at 24-25, *Tolan v. Cotton*, 134 S. Ct. 1861 (2014) (No. 13-551), *available at* http://bit.ly/2ySpFkB.

Thus, it appears that if bias was unconscious, but one's actions based on those biases were unreasonable, then it appears that qualified immunity is inapplicable. Here, if the actions of those involved in the tenure decision were unreasonable because of these biases, qualified immunity would not apply. Greenwald's testimony offers specific indications of implicit bias in Haynes case in his expert report, which are relevant to the issue of qualified immunity, especially since SOE was well aware and widely discussed the issue of the marginalization of African-American faculty in SOE.

**V.D.** **ALL INFERENCES WERE MADE IN FAVOR OF SOE, AND MATERIAL EVIDENCE WAS IGNORED OR MISREPRESENTED BY THE DISTRICT COURT. THUS, THE SEVENTH CIRCUIT SHOULD REVERSE THE DISTRICT COURT'S DECISION GRANTING SOE'S MOTION FOR SUMMARY JUDGMENT.**

**V.D.1.** **By ignoring and misconstruing critical evidence, the district court improperly made all inferences in SOE's favor.**

*a. The district court misrepresented SOE's own statements on the known negative reputations of the external reviewers assigned to Haynes.*

The district court concluded that Haynes offered no evidence that two of his external reviewers, Gibbons and Hardré, were "known to have a negative reputation." (App-3400-401 n.1). The district court instead found that statements about these external reviewers were only a "reflect[ion] on [Hardré's] review of Haynes' dossier." *Id.*

Haynes argued that "Brush provided Haynes with suggestions for additional external reviewers that included at least two suggestions of reviewers who were *known* to be negative: (1) Andrew Gibbons; and (2) Patricia Hardré." Haynes directly quoted an email from Brush to Boling in which Brush stated he "always thought [Gibbons] was kind of critical" and "a 'stay away' person." (App-632).[4]

Nonetheless, in App-629, Boling discusses Hardré's reputation with Brush:

The terriblest [sic] letter [for Haynes] is from Pat Hardre . . . . I recommended against her for Yonjoo because this is the way Pat writes—incredibly harsh and repetitively so; also somewhat unprofessionally if you ask me.

(App-629). It is unclear how Boling's statement was unrelated to Hardré's known reputation; it discusses the typical "way" that she "writes," and was not limited to Hardré's review of

---

[4] Unfortunately, Haynes cited "DOE 37" instead of DOE 39; DOE 39 was included in Haynes's designation, and the quote of DOE 39 was accurately quoted by Haynes. (App-632).

Haynes. (App-629). This was a direct misquotation and misrepresentation of Haynes's evidence.

> b. *The district court ignored evidence that not all IST Department faculty had approved the revised summaries.*

The district court concluded, against the evidence, that all summaries had been "approved by all IST Department members." (App-3402-403). In fact, the summaries were not approved by Bichelmeyer. Brush specifically told Alexander that "everyone except Barb" approved of the final departmental summary. (App-1722).

> c. *Haynes cited evidence directly stating Cho's negative teaching evaluations were glossed over during her tenure review.*

The district court concluded that "Haynes claims broadly Cho 'received "negative teaching evaluations" that were glossed over at all levels of review, but fails to provide any analysis in this regard and therefore this unsupported allegation is disregarded." (App-3403 n.3). This was a misrepresentation of Haynes's evidence. Haynes provided evidence that this glossing over was mentioned by IST Department faculty member Curtis Bonk, who—in discussing Cho's Department summary—stated:

> [I]n regards to teaching and mentoring, I remain somewhat concerned after about her interactions with students (especially international ones) after discussions with students just prior to AECT and then more of the same during AECT in the past few days. **As a member of the merit review committee for several years, saying that 'evaluations that were not extremely positive' is awfully kind given her awful reviews for many years.**

(App-791) (emphasis added). Haynes also cited Bonk's own deposition testimony. (App-1978 at 190-91). The district court's finding that this plain statement was an "unsupported allegation" was false. (App-3407 n.3).

Accordingly, the Court misrepresented Haynes's evidence that was fully supported by an IST Department faculty member.

> d. *Evidence related to Glazewski's substantive changes to the PTC Report was improperly discarded by the district court.*

Although Glazewski—Brush's protégé—showed animus against Haynes by fundamentally and materially altering the SOE-level report against Haynes, the district court failed to "demonstrate any import . . . since it would appear that the reason for his tenure denial, his research, was given a greater assessment in the final memorandum." (App-3404 n.2).

Nonetheless, Glazewski torpedoed Haynes's application for tenure before the PTC ever met and even circulated a draft against Haynes on October 2, 2013—before the Committee's first meeting on October 3, 2013. (App-630-31; App-1720). Glazewski fundamentally altered the initial draft of the PTC's report, changing the vast majority of its positive statements to negative or neutral statements. (App-1712-14). *See supra* III.E.9. This evidence creates a reasonable inference that Glazewski voted no and intended to vote no before ever reviewing Haynes's file.

The SOE PTC's Report, on which Glazewski was the "first reader and principal writer" also manipulated a quotation from an external reviewer discussing Haynes's research from what was actually a positive statement into a negative statement. (App-583-84; App-3379). *Compare* App-582 *with* App-616. *See supra* Section III.E.9.

Glazewski was not acting independently, or in a vacuum; instead, she specifically solicited Brush's advice in how to speak about Haynes to the PTC. *E.g.*, App-873; App-875. *See* App-3202. These changes and behavior by Glazewski directly related to an animus

41

against Haynes, which impacted Haynes's tenure review because her changes were incorporated into the PTC Report that was relied on at all subsequent levels of review.

The evidence that was completely ignored by the district court supplies both indirect evidence of pretext as well as direct, circumstantial evidence of an animus against Haynes.

**V.D.2. The district court committed a legal error in ignoring evidence seemingly because it was self-serving, despite other evidence that supported Haynes's assertions.**

The Seventh Circuit recently clarified that "self-serving" testimony is permissible and sufficient alone to defeat a summary judgment motion. *McKinney v. Office of the Sheriff*, 866 F.3d 803, 814 (7th Cir. 2017). Judge Hamilton reasoned:

> Our cases for at least the past fifteen years teach that **[s]elf-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment**. We have tried often to correct **the misconception that evidence presented in a 'self-serving' affidavit is never sufficient to thwart a summary judgment motion** . . . . Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving. As we have repeatedly emphasized over the past decade, **the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment**.

*Id.* at 814 (quotations omitted) (emphasis added).

> a. *The district court omitted evidence that Haynes had corrected the issues identified in his third-year review and even achieved an "exemplary" rating on his research only months before his tenure review.*

The district court focused, at length, on Haynes's third-year review (App-3396-97), but ignored Haynes's evidence he had corrected the issues identified in this review and improved his application for tenure, receiving an award based on his research as well as a nomination for his mentoring of students; Haynes also was part of a team who received a $1.4 million grant from the National Science Foundation. (App-2340¶4; App-2342¶¶14, 16;

App-1294). There was no reason to omit this evidence entirely unless the district court excluded it because Haynes's testimony was self-serving.

Even if this testimony was inadmissible because it was self-serving, Haynes offered other objective evidence he had made improvements that was wrongly ignored by the district court. Despite mentioning the annual reviews of faculty (App-3396), the district court totally omitted that on his February 26, 2013, annual review—conducted only seven months before his tenure review—Haynes was rated as "exemplary" in the area of research. (App-539). This was improper, especially as this annual review provided evidence that Haynes had cured the deficiencies in his third-year review.

> b. *The district court omitted Haynes's evidence that the teaching evaluation numbers presented at the IST Department were misrepresented.*

The district court also ignored Haynes's evidence showing Ottenbreit-Leftwich altered his teaching evaluation scores and thus made a substantial misstatement of Haynes's teaching evaluations. Similar errors were subsequently included in Brush's report but also ignored by the District court. (App-2459-60; App-2344-45¶24). *See supra* Sections III.E.7, III.E.8.

There was no reason to omit this evidence entirely unless the district court assumed it was self-serving. This was improper, as this fully explained and in-depth analysis supporting Haynes's argument that the tenure review process was manipulated against him. This was further evidence of pretext.

**V.D.3.** **The trial court ignored highly relevant direct evidence in what appeared to be a misapplication of this Court's instruction in *Ortiz*.**

In *Ortiz*, the Seventh Circuit repudiated the need to separate "direct" evidence from "indirect" evidence as "if they were subject to different legal standards." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016). "'[A]ll evidence belongs in a single pile and must be evaluated as a whole' rather than separated artificially between direct and indirect methods of proof." *Volling v. Kurtz Paramedic Servs.*, 840 F.3d 378, 383 (7th Cir. 2016) (quoting *Ortiz*, 834 F.3d at 766).

Despite this directive, the district court specifically divided Haynes's evidence into the indirect and direct evidence piles and then ignored Haynes's direct evidence.

> a. *The district court ignored multiple pieces of circumstantial evidence presented by Haynes, without basis.*

Haynes can prove his discrimination claims through indirect or direct evidence, including circumstantial evidence. *Volling*, 840 F.3d at 383. Haynes offered circumstantial evidence, which "is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508 n.17 (1957)). "Circumstantial evidence typically includes (1) suspicious timing, ambiguous statements (oral or written) or behavior toward, or comments directed at, other employees in the protected group . . . or (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Boss v. Castro*, 816 F.3d 910, 916-17 (7th Cir. 2016).

The district court discarded undisputed evidence that the IU SOE has never granted tenure to an African-American male in its over 100-year existence because Haynes had not provided a full argument related to disparate impact. (App-3427 n.10). Nonetheless, this failure to ever bestow tenure on an African-American male was proper, circumstantial evidence relating to SOE's behavior toward, or comments directed at, other employees in the protected group as well as the issue of pretext. No argument on disparate impact was necessary.

c. *The district court also omitted undisputed evidence that SOE marginalized its minority faculty.*

IU, SOE, and the IST Department were keenly aware of the lack of diversity, especially as it relates to African-Americans. The internal Blue Ribbon Committee report specifically found that a "challenge" was "[i]ncluding within our own ranks an equitable representation of students, faculty, and staff of color;" and noted the Committee was "highly concerned about our inability to do better" in inclusion, so it sought assistance in "embracing people of color and diverse socioeconomic and cultural backgrounds into our efforts at all levels." (App-1089; App-1112). Indeed, an external review of the IST Department itself in March 2014 found that social cliques existed and negatively impacted the Department. (App-2476-76).

The "IUB Mentoring Program" created by the Affirmative Action Plan was designed to "serve[] as a tool for retaining the best faculty by reducing the problems many new faculty members, especially faculty of color, are confronted with on a new campus," including "a

sense of isolation and alienation from existing collegial networks, uncertainty over policies and procedures, and lack of social engagement." (App-1567).

Considering this marginalization of minority faculty at SOE was proper, circumstantial evidence relating to SOE's behavior toward, or comments directed at, other employees in the protected group.

### d. The district court ignored the IST Department faculty showed animosity against Haynes.

Brush exhibited a direct animus against Haynes—he accused Haynes of not being able to communicate: "Does he read the shit he writes? This is why he is having trouble with tenure. He can't communicate with anyone." (App-794). Brush thought he just didn't belong: "I really like him but this is not the right job for him." (App-878). Brush could not demonstrate any friendships or working relationships with other African-Americans, and he held Haynes at arms' length with a "standoffish disposition and attitude;" he never went to lunch with Haynes or had any meetings "beyond typical faculty meetings." (App-2201 at 121-22). Brush was biased against Haynes based on his race, African-American; and, Brush impacted all levels of review of Haynes's application for tenure. *See, e.g.*, App-601-604, App-632-33, App-664-66, App-705, App-710, App-771, App-774, App-781, App-794, App-797, App-856-67, App-892.

Similarly, unlike Ottenbreit-Leftwich, Brush provided Haynes with a tepid report. Brush's report failed to support Haynes with any measure of enthusiasm. (App-2456-62). Brush never stated that he believed Haynes had actually earned tenure. Instead, he stated that he "support[ed] the faculty recommendation to award promotion to Associate Professor with tenure to Dr. Haynes." (App-2461-62). This statement stood in stark contrast to his

enthusiastic support for Ottenbreit-Leftwich: "the primary committee—**as well as myself—recommend** the awarding of promotion and to Associate Professor with tenure to Dr. Leftwich." (App-950-51) (emphasis added).

The IST Department also generally marginalized Haynes. For instance, Haynes had little to no support preceding his application for tenure. (App-2341¶11; App-1833 at 12). In addition, no formal teaching feedback provided by from IST Department faculty. Haynes was forced to seek reviews from two, respected, senior full professors from other departments. During Haynes's faculty appointment, he was not invited to social lunches or social functions beyond normal faculty meetings that might include lunch, and except for two instances, one of which Haynes initiated, Haynes was not invited to be part of research or writing projects with any of the professors in the IST Department. Multiple times, his fellow faculty in the IST Department stated he did not belong. *E.g.*, App-2705, App-2757 (Haynes "just needs to understand that he's not a good fit at IU and move on"); App-892 ("Maybe Frank can help Ray see he would be good in adult ed.").

The evidence Haynes was specifically marginalized and ostracized from the IST Department is evidence of a racially discriminatory animus against Haynes.

> e. *Although she controlled and manipulated Haynes's tenure review process, the district court failed to consider any of Alexander's misrepresentations or actions against Haynes.*

The district court ignored evidence that Alexander exerted her influence against Haynes's application for tenure and materially impacted the decision against him. Specifically, Alexander further "emphasize[d]" to Brush that "we need to be able to do the 'tough' thing sometimes (meaning vote no)." (App-601).

In a meeting with Brush on July 19, 2013—well ahead of the tenure review—Alexander also grievously misrepresented the content of an external review by former Dean, Frances Kochan. *Compare* App-611 *with* App-781-82. Alexander told Brush that Kochan's letter was "lukewarm." (App-781-82). But Kochan concluded Haynes's research was "unquestionably excellent" and "superior in all regards;" Kochan could not "speak highly enough about the research work that Dr. Haynes has done." (App-611).

While Alexander's task was to "move the process along" but "not to enter judgment" (App-1783 at 97; App-1805 at 187), Alexander also exercised her own vote in the process by initially reaching a decision against tenure and drafting the letter from Dean Gonzalez to Haynes (App-652-56), which was accepted by Gonzalez. (App-752).

Alexander therefore actively passed judgment on Haynes's tenure application and actively worked to negatively influence Haynes's tenure review. Alexander's animus and attempts to manipulate the process is further direct evidence that the decision denying Haynes's application for tenure was racially discriminatory and pretextual.

> f. *The racially discriminatory undertones in Hardré's external review of Haynes were never mentioned by the district court.*

The district court omitted the racially discriminatory undertones contained in Hardré's review (App-3401), although Hardré's external review letter contained direct references to Haynes's race and stereotypes based on Haynes's race. For instance, Hardré suggested what little success Haynes had achieved in her judgment was garnered solely because of his race, African-American:

> Considering the range of similar work in the field, with the exception of the very unique specialization of "inclusion" and his identity as African-American scholar, not much is new here.

(App-613). Hardré was further disappointed she was unable to support Haynes, as a "underrepresented minority:"

> I am always eager to support and endorse a colleague who is a member of an underrepresented minority, who crosses the scholar-practitioner gap, and whose work reflect [sic] a productive and emerging strand of specialized scholarship.

(App-614). Reflecting the stereotypes of African-Americans as unintelligent and prone to exaggeration, Hardré said Haynes seemed "just a bit too desperate" and overly aggrandized his qualifications as a scholar by "'push[ing]' the value of his work" and "overstating it." (App. 612-14).

Hardré's review was heavily relied on at all levels of Haynes's tenure review. (App-569-98). *See supra* at Section III.E.5, III.E.10. The reliance on a racially biased external review was further evidence that Haynes was denied tenure based on his race. Because the district court ignored significant evidence of discrimination, this Court should reverse the district court's decision granting summary judgment.

### V.D.4. The district court even assumed SOE made arguments that were never made, prohibiting Haynes from responding to a new argument in his Surreply.

The district court also refused to allow Haynes to surreply on the issue of the cat's paw theory addressed for the first time in SOE's Reply because although SOE never argued it in its initial brief, "Defendants sufficiently asserted [it] in their initial brief." (App-3181-82). Nonetheless, this was a totally new argument based on entirely separate case law. The arguments that were purportedly identical did not even cite the same law. *Compare* App-62-63 *with* App-2674-75. SOE's initial brief more focused on the issue of pretext generally, whereas

SOE's Reply was completely focused on the cat's paw theory. *Compare* App-62-63 *with* App-2674-75. The district court deprived Haynes of an opportunity to respond to a new argument raised in SOE's Reply. This was an abuse of discretion.

**V.E.   BECAUSE EQUITABLE TOLLING SHOULD HAVE APPLIED, HAYNE'S TITLE VII CLAIM SHOULD NOT HAVE BEEN FORFEITED.**

"[W]ith equitable tolling, it is well-established that the limitations period is tolled until facts that would support a charge of discrimination . . . [are] apparent or should [be] apparent to a person with a reasonably prudent regard for his rights similarly situated to the plaintiff." *Mull v. ARCO Durethene Plastics, Inc.*, 784 F.2d 284, 291 (7th Cir. 1986) (quotations omitted). Moreover, "[o]n a motion for summary judgment, the burden is on the plaintiff to present facts which, if true, would justify equitable tolling of the statute of limitations." *Douglas v. Potter*, 268 F. App'x 468, 471 (7th Cir. 2008) (quotation omitted). This Court reviews *de novo* determinations on summary judgment rejecting equitable tolling. *Stark v. Dynascan Corp.*, 902 F.2d 549, 551 (7th Cir. 1990).

Although Haynes was given notice of the denial of his tenure application in April 2014, Haynes argued that "Haynes was not reasonably aware of a discrimination claim until March 2015, when he submitted his appeal to President McRobbie;" and "Haynes thus submitted his EEOC charge within weeks of learning discrimination was involved in the denial of his case for tenure." (App-467-70). *See also* App-3192 ("Multiple documents relied on by Haynes to support [these] claims of race discrimination were not provided until March 2015." (citing App-2346-47¶¶27-30; App-2926¶¶4-7).

The district court found that "Dr. Haynes' assertion that the 'key documents' provided in March 2015 provided him the information necessary to put the pieces together

is baseless;" and "none of the information cited by Dr. Haynes provides any indication of discriminatory animus during his tenure process . . . ." (App-3423-24). The district court failed, however, to make any reasonable inferences in Haynes's favor and instead made a credibility determination that is reserved for the factfinder. *Jackson v. Potter*, 240 F. App'x 136, 138 (7th Cir. 2007). *See, e.g.*, *Malozienc v. Pac. Rail Servs.*, 606 F. Supp. 2d 837, 879 (N.D. Ill. 2009) ("Viewing the facts in a light most favorable to Plaintiff, . . . Plaintiff has raised a question of fact as to whether it is appropriate to invoke the doctrine of equitable tolling.").

The district court made an improper judgment call about the credibility of Haynes's testimony that should have been reserved for the factfinder. *See Sperry v. Barggren*, 523 F.2d 708, 711 (7th Cir. 1975) (reversing trial court's rejection of equitable tolling because despite defendants' evidence suggesting the documents at issue in plaintiff's equitable tolling claim were accessible, "issues of fact must be resolved by trial and not by affidavits"). *See also Estate of Perry v. Wenzel*, 872 F.3d 439, 454 (7th Cir. 2017) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (quoting *Anderson*, 477 U.S. at 255).

As a result, this Court should reverse the district court on the issue of equitable tolling.

## VI. <u>CONCLUSION</u>

For all the foregoing reasons, the Court should reverse the District's Court's Order granting of the SOE's Motion for Summary Judgment and should remand this matter to the district court for a determination on the merits.

Respectfully submitted,


*s/ Sandra L. Blevins*
Kevin W. Betz
Sandra L. Blevins
Courtney E. Endwright

## VII.     <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Appellant's Corrected Brief complies with the type-volume limitations of Fed.R.App.P. 32(a)(7)(B). This brief contains 13,997 words this 28th day of November, 2017.

*s/ Sandra L. Blevins*
Sandra L. Blevins

## VIII.     <u>DIGITAL MEDIA STATEMENT</u>

I hereby certify that pursuant to Circuit Rule 31(e) that the text of this brief has been provided on digital media.

*s/ Sandra L. Blevins*
Sandra L. Blevins

## IX.     <u>STATEMENT OF INCLUSION</u>

I hereby certify that pursuant to Circuit Rule 30(a) and (b) that the parts of the record required to be included in the Corrected Appendix are provided.

*s/ Sandra L. Blevins*
Sandra L. Blevins

## X.  <u>PROOF OF SERVICE</u>

I hereby certify that a copy of the foregoing have been served upon the following

counsel of record this 28th day of November, 2017, via ECF Service:

> Michael C. Terrell
> Melissa A. Gardner
> TAFT STETTINIUS & HOLLISTER LLP
> One Indiana Square, Suite 3500
> Indianapolis, IN 46204-2023

*s/ Sandra L. Blevins*
Sandra L. Blevins

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

**Appeal No.: 17-2890**

| | | |
|---|---|---|
| RAY K. HAYNES, | ) | Appeal from the U.S. District Court |
| | ) | for the Southern District of Indiana, |
| Plaintiff, | ) | Indianapolis Division |
| | ) | |
| vs. | ) | |
| | ) | |
| INDIANA UNIVERSITY, THE BOARD OF | ) | |
| TRUSTEES OF INDIANA UNIVERSITY, | ) | |
| MICHAEL A. McROBBIE, in his official | ) | |
| and individual capacity, LAUREN K. ROBEL, | ) | |
| in her official and individual capacity, ELIZA | ) | |
| PAVALKO, in her official capacity, THOMAS | ) | Cause No. 1:15-cv-1717-LJM |
| F. GIERYN, in his official and individual | ) | |
| capacity, TERRENCE C. MASON, in his | ) | |
| official capacity, GERARDO M. GONZALEZ, | ) | The Hon. Larry J. McKinney |
| in his official and individual capacity, GARY | ) | |
| M. CROW, in his official capacity, JOYCE M. | ) | |
| ALEXANDER, in her official and individual | ) | |
| capacity, and THOMAS A. BRUSH, in his | ) | |
| official and individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>SHORT APPENDIX OF APPELLANT</u>

Kevin W. Betz
Sandra L. Blevins
Courtney E. Endwright
BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com

*Attorneys for Plaintiff-Appellant Ray K. Haynes*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................i

ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY AND MOTION TO SUPPLEMENT EVIDENCE DATED JULY 31, 2017........................ 000001

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DATED AUGUST 18, 2017................................................................................ 000010

ENTRY OF JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURAL 58 DATED AUGUST 18, 2017 ............................................... 000046

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RAY K. HAYNES Ph.D.,                  )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )     No. 1:15-cv-01717-LJM-DKL
                                      )
INDIANA UNIVERSITY,                   )
THE BOARD OF TRUSTEES OF              )
INDIANA UNIVERSITY, et al.            )
                                      )
            Defendants.               )
                                      )
                                      )

### ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY AND MOTION TO SUPPLEMENT EVIDENCE

This matter is before the Court on Plaintiff Dr. Ray Haynes' Motion for Leave to File Surreply in Opposition to Defendants' Motion for Summary Judgment ("Motion for Leave"). Dkt. 130. Dr. Haynes asserts that Defendants raised new arguments, evidence, and objections in their reply brief. Dkt. 94. Dr. Haynes has also submitted a Motion to Supplement Plaintiff's Designation of Evidence in Opposition to Defendant's [sic] Motion for Summary Judgment ("Motion to Supplement"). Dkt. 132. The Court will address each of these motions in turn.

### I. MOTION FOR LEAVE

Local Rule 56-1(d) states, "A party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." It further states that the surreply "must be limited to the new evidence and objections." "District courts are entitled to

000001

'considerable discretion in interpreting and applying their local rules.'" *Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.* 800 F.3d 853, 858 (7th Cir. 2015) (quoting *Cuevas v. United States*, 317 F.3d 751, 752 (7th Cir. 2003)).

Dr. Haynes has submitted his proposed surreply with his Motion for Leave. Dkt. 130-1.

## A. NEW EVIDENCE

Dr. Haynes claims that Defendants introduced new evidence in their reply brief, including: (1) an affidavit from Defendants' counsel (Dkt. 121-1); (2) an affidavit from Krista Glazewski (Dkt. 121-2); (3) a book chapter entitled "Complex Adaptive Mentoring Programs: How to Use in Developmental Networks" by Dr. Haynes (Dkt. 121-3); (4) additional designations from the deposition of Gerardo Gonzalez (Dkt. 121-4); (5) an email from Thomas Brush to Elizabeth Boling (Dkt. 121-5); (6) additional designations from the deposition of Joyce Alexander (Dkt. 121-6); (7) external reviews of Yonjoo Cho (Dkt. 121-7); (8) an affidavit from Jane Kaho (Dkt. 121-8); and (9) excerpts from the deposition of Barbara Bichelmeyer (Dkt. 121-9). Dkt. 130 at 2. Dr. Haynes asserts that this new evidence is not admissible and that Defendants use it to advance new arguments. Dkt. 130 at 2.

Dr. Haynes first challenges the affidavit from Defendants' counsel and how it relates to when Dr. Haynes acquired knowledge of alleged discrimination. Dr. Haynes claims that this affidavit is not admissible because Defendants' counsel lacked personal knowledge. Dkt. 143 at 6-7. "An affidavit or declaration used to support a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R.

2

Civ. P. 56(c)(4) ("Rule 56(c)(4)").   The affidavit states Defendants' counsel was responsible for the production of documents to Dr. Haynes, which is sufficient to establish that Defendants' counsel possessed personal knowledge and was competent to testify as to their production.  Dkt. 121-1.  Therefore, the affidavit is admissible.

Nonetheless, the affidavit does raise new evidence in support of Defendants' allegation that Dr. Haynes' claims were not timely filed.  In their original brief, Defendants simply cite to the Complaint to prove that Dr. Haynes was aware of the alleged evidence of discrimination as early as October 24, 2014.  Dk. 67 at 15-16.  The affidavit of Defense counsel, however, sheds new light on this alleged admission and constitutes new evidence.  Accordingly, Dr. Haynes shall be permitted to respond to the allegations in Defendants' counsel's affidavit.

Dr. Haynes also cites the other evidence raised for the first time in Defendants' reply brief as "new evidence and new arguments" to which he should be able to respond. Dkt. 143 at 13.  Dr. Haynes specifically cites to his proposed surreply to demonstrate that there was: (1) admissible evidence that he was qualified for tenure; (2) ample evidence of a pattern of discrimination against African American males; and (3) sufficient evidence of bias against Dr. Haynes during his tenure review process.  Dkt. 143 at 13.  In his proposed surreply, Dr. Haynes introduces evidence from two experts, Dr. Laura Perna, to establish that he was as qualified as a professor that received tenure the year before Dr. Haynes' review; and Dr. Anthony Greenwald, to establish that there were multiple indications of implicit bias in Dr. Haynes' tenure review.  Dkt. 130-1 at 13-17.  Notably, however, neither of the experts' proposed evidence relates to alleged the "new evidence" that Dr. Haynes cites in his Motion for Leave.  Moreover, none of the allegedly new

3

evidence or new arguments cited by Dr. Haynes is mentioned in this section of his proposed surreply.   Dr. Haynes' proposed argument is not related to the allegedly new evidence or new arguments he cites and must be rejected.

Accordingly, Dr. Hayne's Motion for Leave to respond to Defendants' new evidence is **GRANTED in part and DENIED in part**.

### B.  QUALIFIED IMMUNITY

Defendants argued in their initial brief that both Indiana University and the individually named defendants have sovereign immunity from Dr. Haynes' Section 1981 claims.   Dkt. 67 at 15-17.   Specifically, Defendants argued that all of them are immune from monetary losses incurred by Dr. Haynes' denial of tenure.   Dkt. 67 at 15-17.   Dr. Haynes claims that the Defendants argued in their reply brief, for the first time, that Defendants seek immunity from both monetary and injunctive relief and assert qualified immunity as a defense.   Dkt. 130, ¶¶ 9, 10.   Defendants made clear in their initial brief that they only sought to bar Dr. Haynes' monetary claims.   Dkt. 67 at 15-17. Defendants did not, however, raise the qualified immunity defense until their reply brief. Therefore, Dr. Haynes' Motion for Leave to respond to Defendants' qualified immunity argument is **GRANTED in part and DENIED in part**.

### C.  CAT'S PAW ARGUMENT

Dr. Haynes also seeks to file his surreply in response to Defendants' "cat's paw" theory, which he claims is first introduced in Defendants' reply.   Dkt. 143 at 11-12.   Dr. Haynes seeks to rebut this argument and once again introduce the expert report of Dr. Greenwald.  In a "cat's paw" case, an employee seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment

4

decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 416 (2011).  Dr. Haynes claims that Defendants did not argue this theory in their initial brief and that he should not have to "forecast" that the argument would be made in their reply.  Dkt. 143 at 11.  Defendants stated in their initial brief, however, that "Dr. Haynes has no evidence that any of the decision-makers at the higher levels of review were influenced by any alleged improper motivation on the part of Dr. Alexander or Dr. Brush."  Dkt. 67 at 31.  Although Defendants specifically label their argument as a "cat's paw" theory for the first time in their reply brief, Defendants sufficiently asserted in their initial brief the belief that "cat's paw" liability was not applicable in this case.  It should also be noted that a "cat's paw" theory is one that is advanced by aggrieved employees, in this case Dr. Haynes.  Therefore, if Dr. Haynes had any evidence or argument relating to this type of liability, it was incumbent upon him to raise it in his response brief rather than wait for "an opportunity to rebut this new argument" in a surreply.  Dkt. 143 at 11.  *See U.S. ex rel. Abner v. Jewish Hosp. Health Servs.*, 4:05-cv-106-RLY-WGN, 2010 WL 811288, at *1 (S.D. Ind. Mar. 3, 2010) (stating that a "party is not entitled to hold back evidence until the filing of a surreply.").

Accordingly, Dr. Haynes' Motion for Leave with respect to Defendants' "cat's paw" theory is **DENIED**.

### D.  SUPPLEMENTARY DESIGNATION

Finally, Dr. Haynes seeks to provide "a supplementary designation of evidence in response to Defendants' objections to his evidence."  Dkt. 143 at 12.  Specifically, Dr. Haynes offers the full expert report of Dr. Perna "in response to challenges to his evidence, including reports from his experts."  Dkt. 143 at 12.  This logic is incongruous with the purpose of Local Rule 56-1(d), which requires that surreplies address new

000005

evidence or arguments submitted for the first time in a reply brief.  Dr. Haynes essentially argues that because Defendants objected to Dr. Perna's declaration in their reply, Dr. Haynes is now allowed to submit the full expert report to address these objections, rather than actually address the objections to the declaration themselves.  This backdoor attempt to admit his expert's testimony contravenes the purpose of Local Rule 56-1(d).  Therefore, Dr. Haynes' Motion for Leave to file supplementary evidence is **DENIED**.

## II.  <u>MOTION TO SUPPLEMENT</u>

In his Motion to Supplement, Dr. Haynes seeks to augment his response in opposition to summary judgment with the expert reports of Dr. Perna and Dr. Greenwald.[1] Dkt. 132.  Dr. Haynes claims that the expert reports were "indisputably unavailable" at the time he filed his response brief.  Dkt. 147 at 4.  Dr. Haynes states that "it is totally understandable why both of Dr. Haynes's [sic] experts, who are indisputably both in the field of academia, would be extremely busy in the month of May due to the end of the [s]pring 2017 term."  Dkt. 147 at 4.  Yet it is far from understandable why Dr. Haynes is attempting to bring forth this evidence at this juncture in the proceedings after the Defendants' Motion for Summary Judgment has been fully briefed and is ripe for adjudication.  Moreover, the only time that Dr. Haynes ever mentioned the need for more time relating to his experts was in his Motion for Enlargement of Time to Disclose Experts and Complete Expert Discovery ("Motion for Enlargement") filed on April 25, 2017.  Dkt.

---

[1] Dr. Haynes also seeks to supplement his response in opposition to summary judgment with an email chain that he claims he specifically referred to in the response, but fails to provide a citation for it. The Court declines to scour the response in an attempt to discover the email chain's location.  *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").  Accordingly, Dr. Haynes has waived his right to supplement this piece of evidence.

6

86.  In the Motion for Enlargement, Dr. Haynes indicates that his intended experts were preparing for finals at the end of the spring 2017 term, but also explicitly states that "[t]he relief sought in this Motion does not disturb the dispositive motion deadlines or any other deadlines in this matter[.]"  Dkt. 86, ¶ 14.  And, although Dr. Haynes complains that the Defendants did not object to the extensions for his expert disclosures, that failure to object in no way relates to the use of expert testimony in a response on summary judgment. Dkt. 147 at 2.

Most telling, however, is that beginning on April 20, 2017, Dr. Haynes filed four extensions of time in which to file his response brief and not one of these motions alluded to the unavailability of Dr. Haynes' expert reports.  Dkts. 81; 91-93.  He also filed a Rule 56(d) motion, arguing that additional discovery was necessary for him to fully respond to the motion for summary judgment, but did not mention anything related to his experts.  Dkt. 109.  In the ruling on Dr. Haynes' Rule 56(d) motion, the Court noted that any alleged discovery issues "should have been addressed in a timely fashion first with the parties and then with the Court."  Dkt. 150 at 21.  The same holds true in this instance. If Dr. Haynes wished to utilize the expert reports in his response brief, he should have petitioned the Court for more time for his experts to complete the reports prior to the deadline for his response brief; allowing Dr. Haynes to supplement his response at this stage would be prejudicial to the Defendants.  For these reasons, Dr. Haynes' Motion to Supplement is **DENIED**.

7

### III. CONCLUSION

In summary, the Court hereby **GRANT in part and DENIES in part** Dr. Haynes' Motion for Leave (Dkt. 130); and **DENIES** Dr. Haynes' Motion to Supplement (Dkt. 132). Within seven (7) days from the entry of this Order, Dr. Haynes shall file a surreply to address Defendants' counsel's affidavit and Defendants' theory on qualified immunity. Dr. Haynes is reminded that any evidence submitted in the surreply must be limited to the affidavit and the qualified immunity arguments and any extraneous evidence will be stricken completely.

IT IS SO ORDERED this __31st__ day of July, 2017.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

8

000008

Distribution:


Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Courtney E. Endwright
BETZ & BLEVINS
cendwright@betzadvocates.com

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Melissa A. Gardner
TAFT STETTINIUS & HOLLISTER LLP
mgardner@taftlaw.com

Michael C. Terrell
TAFT STETTINIUS & HOLLISTER LLP
mterrell@taftlaw.com

Michele Lee Richey
TAFT STETTINIUS & HOLLISTER LLP
MRichey@taftlaw.com

000009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RAY K. HAYNES Ph.D.,                    )
                                        )
                    Plaintiff,          )
                                        )
        vs.                             )       No. 1:15-cv-01717-LJM
                                        )
INDIANA UNIVERSITY,                     )
THE BOARD OF TRUSTEES OF                )
INDIANA UNIVERSITY, et al.              )
                                        )
                    Defendants.         )
                                        )

## ORDER

Before the Court are various motions filed by both parties.  Defendants have filed a Motion for Summary Judgment (Dkt. 66) and Motion to Strike Designation of Evidence Report of Dr. Laura W. Perna ("Motion to Strike") (Dkt. 117).  Plaintiff Dr. Ray Haynes has filed a Motion for leave to File Surreply in Opposition to Defendants' Motion to Strike ("Surreply Motion") (Dkt. 148) and a Motion for Relief Under Rule 60 ("Motion to Reconsider") (Dkt. 165).  Dr. Haynes, who is African American, has alleged that the Defendants racially discriminated against him when they denied him tenure.  Dkt. 1. Defendants claim that Dr. Haynes has failed to establish any nexus between the denial of his tenure and his race.  Defendants also ask the Court to strike Dr. Perna's expert report submitted with Dr. Haynes' Response in Opposition to Motion for Summary Judgment.  Dkt. 94.  The Court will address each motion in turn.

000010

## I. BACKGROUND

### A. DR. HAYNES' APPOINTMENT

The facts most favorable to Haynes are as follows:  Indiana University (the "University") hired Dr. Haynes on May 21, 2008, as an assistant professor in the Instructional Systems Technology Department (the "IST Department") of the School of Education.  Dkt. 67 at 3.  A portion of Dr. Haynes' salary was funded by the Strategic Recruitment Fund, the purpose of which is "to facilitate the recruitment of underrepresented minorities and women into the professoriate at Indiana University Bloomington, especially in areas where their presence has been traditionally marginalized."  Dkts. 68-5; 68-6; 68-7.  There are no African American males in the School of Education.  Dkt. 102-5 at 29-30.  Dr. Haynes' initial appointment was for three academic years from August 1, 2008, to May 31, 2011.  Dkt. 68-10.  The University reappointed Dr. Haynes in one-year terms from 2011 through 2015.  Dkt. 68-12.   Dr. Haynes was given a six-year probationary period at the end of which a tenure decision would be made.  Dkt. 68-13.  During his time there, Dr. Haynes was one of two African Americans in the School of Education on track for tenure.  Dkt. 102-12 at 3.

The IST Department evaluated Dr. Haynes on an annual basis.  Dkt. 68-11 at 32.  The third-year review, which is conducted by a three-person review committee, "is an opportunity to obtain feedback on the tenure track faculty member's progress toward tenure."  Dkt. 68-16 at 1.  In Dr. Haynes' third-year review, the committee stated that "the consensus of the entire committee is that Dr. Haynes has not done an adequate job of providing evidence of having made sufficient progress toward tenure that we would expect for a faculty member completing his third full year at Indiana University."  Dkt. 68-

2

000011

15 at 1.  It also noted that "should his performance and productivity not improve during the next three years … he will have an extremely difficult time making an adequate case for tenure and promotion."  Dkt. 68-15 at 1.  To improve, the committee recommended that Dr. Haynes increase the amount of empirical research pieces, rewrite his candidate statement, and provide evidence of continuous improvement in teaching.  Dkt. 8-15 at 1-3.

## B.  DR. HAYNES' EXPERIENCE AT THE UNIVERSITY

Dr. Haynes claims that he felt marginalized by the School of Education faculty and felt as though he was not a part of the "in" group.  Dkt. 102-12 at 2-3.  He also states that his assigned mentor, Barbara Bichelmeyer, was rarely available to him because of her academic appointments.  Dkt. 102-12 at 3.  Nonetheless, Bichelmeyer believed Dr. Haynes to be a "phenomenal classroom teacher" who "did an excellent job of being in the classroom and motivating his students."  Dkt. 102-2 at 13.  Bichelmeyer also indicated, however, that Dr. Haynes had issues "giving timely feedback to students in an online environment."  Dkt. 102-2 at 13.  Dr. Haynes felt that Dr. Thomas Brush, the chair of his department, had a "standoffish" disposition towards him.  Dkt. 102-8 at 32.

## C.  THE UNIVERSITY'S TENURE PROCESS

The standards for tenure at the Bloomington campus are set forth in the Guidelines for Tenure and Promotion Reviews at Indiana University Bloomington ("Guidelines").  Dkt. 68-20.  The Guidelines set forth the mechanisms for reviewing a candidates tenure application and state, "Decisions about tenure and promotion are reached through the comprehensive and rigorous peer review of achievements and promise."  Dkt. 68-20.

000012

Candidates for tenure are evaluated on three areas: (1) research/creative activity; (2) teaching; and (3) service/engagement. Dkt. 68-20 at 3. To achieve tenure, a candidate must be rated excellent in one of the three categories and receive at least a satisfactory/effective rating in the other two. Dkt. 68-20 at 3. The University's School of Education maintains its own criteria for evaluating each category. Dkt. 68-19 at 7-8. To achieve an excellence rating in research, which is the area chosen by Dr. Haynes, requires "[e]vidence that the faculty member is beginning to establish a national and/or international reputation as an original contributor through research." Dkt. 68-19 at 7.

A tenure candidate and the department chair, in Dr. Haynes' case Dr. Brush, work together to assemble the candidate's dossier, which includes a curriculum vitae, a personal statement, and a list of twelve prospective external reviewers. Dkt. 68-20 at 4, 9. The Guidelines require submission of at least six evaluative letters from external reviewers. Dkt. 68-20 at 5. The external reviewers should be leaders in the candidate's field and hold an academic appointment at a peer institution. Dkt. 68-20 at 5.

The review process begins at the candidate's department, then proceeds to the school level, and then finishes at the campus level. Dkt. 68-20 at 1. A faculty review committee writes a substantive report evaluating the candidate's performance in research, teaching, and service, and votes to recommend or deny tenure. Dkt. 68-20 at 1. Following this report, the appropriate administrator (i.e. chair, dean, vice provost) provides a separate substantive evaluation and recommendation. Dkt. 68-20 at 1. Finally, the Vice Provost for Faculty & Academic Affairs prepares the final evaluation and recommendation for the Provost and the President of the University, who in turn make a recommendation to the Board of Trustees. Dkt. 68-20 at 1.

4

000013

## D.  DR. HAYNES' TENURE CANDIDACY

Dr. Haynes chose research as the performance area in which he believed he excelled.  Dkt. 68-11 at 60.  Dr. Haynes was to submit his curriculum vitae, a personal narrative statement, and a list of twelve external reviewers by April 13, 2013.  Dkt. 68-14 at 141; Dkt. 68-12 at 157.

Dr. Haynes' initial list of twelve external reviewers was divided into two groups of six: (1) "Haynes' List of External Reviewers" and (2) "IST Department Chair's List of External Reviewers."  Dkt. 68-4 at 201.  Nonetheless, Dr. Haynes personally chose all twelve external reviewers on the list.  Dkt. 68-11 at 65.  Dr. Haynes submitted his dossier to Jane Kaho, assistant to Executive Associate Dean Joyce Alexander, on April 23, 2013.  Dkt. 68-21.

Dr. Joyce Alexander was responsible for managing the tenure process but did not vote on tenure candidates.  Dkt. 68-3 at 65-66.  Her task was to "move the process along" but "not to pass judgment."  Dkt. 102-1 at 97, 187.  Part of her duties was to facilitate the external review process.  Dkt. 68-3 at 67; 68-4 at 155-57.  Dr. Alexander handled the external review process for both Dr. Haynes and Dr. Yonjoo Cho, another assistant professor in the IST Department who applied for tenure at the same time as Dr. Haynes.  Dkt. 68-4 at 42; 68-11 at 55.  After receiving Dr. Haynes and Dr. Cho's lists of twelve external reviewers, Dr. Alexander noticed that six of the names on each candidates' lists overlapped.  Dkt. 68-4 at 35-36, 41.  To avoid asking the same individuals to review both Dr. Cho and Dr. Haynes, Dr. Alexander assigned the overlapped reviewers to one candidate or the other.  Dkt. 68-4 at 35, 39, 66-69.  This left nine individuals for Dr. Haynes and nine individuals for Dr. Cho from whom to request a review.  Dkt. 68-20 at 46.

000014

On May 22, 3013, Dr. Alexander requested that Dr. Haynes and Dr. Thomas Brush submit additional names for potential external reviewers because only one of the nine individuals for Dr. Haynes agreed to write a review.  Dkt. 68-4 at 70-71, 206-07.  On June 5, 2013, Dr. Brush emailed Dr. Haynes to determine whether he had thought about any additional external reviewers for his case.  Dkt. 68-24 at 3.  Dr. Brush provided five names for Dr. Haynes to consider: (1) Dr. Patricia Hardre; (2) Dr. Doohun Lim; (3) Dr. Rob Branch; (4) Dr. Rita Richey; and (5) Dr. Andrew Gibbons.  Dkt. 68-14 at 249; Dkt 68-24, Ex. A.  In response, Dr. Haynes submitted his second list to Dr. Brush on June 7, 2013; the list included four of the individuals suggested by Dr. Brush (Dr. Hardre, Dr. Richey, Dr. Branch, and Dr. Gibbons), excluded Dr. Lim, and added Dr. Tonnette Rocco and Dr. Anthony Colella.  Dkt. 68-11 at 67-69, 72-75.  Dr. Brush forwarded this list to Dr. Alexander on June 8, 2013.  Dkt. 68-24 at 3.

On August 26, 2013, Dr. Alexander requested three more external reviewers for Dr. Haynes due to one reviewer backing out at the last minute.  Dkt. 68-4 at 100-01, 119; Dkt. 68-24 at 3.  Dr. Brush submitted the third list of external reviewers to Dr. Alexander on August 28, 2013, which included three individuals selected by Dr. Haynes and two suggested by Dr. Brush.  Dkt. 68-11 at 77-80; Dkt. 68-24, Ex. C.

Ultimately, six individuals accepted the invitation to review Dr. Haynes' application for tenure and submit an external review letter: (1) Dr. Frances Kochan; (2) Dr. Patricia Hardre; (3) Dr. Robert Branch; (4) Dr. Andrew Gibbons; (5) Dr. Tonette Rocco; and (6) Dr. Frederick Nafukho.  Dkt. 68-4, Ex. 70; 68-11 at 81.[1]

---

[1] Dr. Haynes claims that two of Dr. Brush's proposed external reviewers, Drs. Gibbons and Hardre, were known to have a negative reputation.  Dkt. 94 at 6.  Dr. Haynes cites only one email that states that Dr. Hardre's external review of Dr. Haynes was "pretty

000015

The external reviewers stated, in part:

(1)  **Dr. Kochan**: I cannot speak highly enough about the research work that Dr. Haynes has done.  The quantity and quality of work are extraordinary; the breadth of the work is extensive; the importance of the work is without question. … I ranked his teaching as excellent, his service as very good, and his research as beyond excellent to superior. Dkt. 95-24 at 3-4.

(2)  **Dr. Hardre**: The tenor of the candidate's personal statement communicates great effort to convince readers that his work is of a caliber higher than any other evidence offered places it.  While claiming its excellence in subjective terms, he does not offer much standardized or comparable evidence of its meeting an objective standard.  I would place this candidate's overall research performance in a grey area of clearly satisfactory, but not clearly excellent.  I wish that I could find more to recommend this candidate, and he may indeed attain excellence and national leadership in his field, but considered in light of the criteria provided, and in comparison to candidates at peer institutions, he does not at this time appear clearly superior.  Dkt. 95-25 at 3.

(3)  **Dr. Branch**:  Dr. Haynes' record of publications and presentations at scholarly forums in educational technology would be considered above average for a peer faculty member at most universities with which I am familiar.  However, his scholarship in the area of human resources development exceeds expectations [and] should be regarded as exemplary. … Overall, Dr. Haynes has demonstrated an ability to teach, conduct research, advise students, develop program curricula, and provide service to the university and community.  Dr. Haynes would have my enthusiastic support and promotion to the rank of Associate Professor if he were at the University of Georgia.  Dkt. 96-1 at 2.

(4)  **Dr. Rocco**:  There is ample evidence in the materials provided to me to state that Dr. Haynes has achieved excellence in his research and is on his way to becoming a leader in mentoring research.  The materials provided do not give me enough information to rate Dr. Haynes as excellent in teaching and service though I suspect that I might be so inclined if I had the necessary information. … Overall, I would recommend Dr. Haynes for tenure and promotion.  Dkt. 96-2 at 3.

(5):  **Dr. Gibbons**:  Overall, I feel that a person with Dr. Haynes' performance record would receive tenure with rank advancement at schools comparable to Indiana University… Given my limited knowledge of HRD literature, I believe Dr. Haynes has

---

tough and with kind of an attitude" and that she is "incredibly harsh and repetitively so; almost unprofessionally."  Dkt. 96-6.  This email chain does not, however, establish anything to establish that Dr. Hardre was "known" to be a negative reviewer nor does it state anything relating to Dr. Hardre's reputation as a reviewer; rather, it reflects on her review of Dr. Haynes' dossier.  Accordingly, the Court will disregard the assertion that Dr. Brush knew that these two individuals had negative reputations.

7

placed his work in a variety of reputable sources. … I feel Dr. Haynes has a promising future.  I can support his application for tenure and rank advancement.  Dkt. 96-3 at 1-2.

(6) **Dr. Nafukho**:  I am familiar with Dr. Haynes' scholarly work … I can state without reservation that his work is positively impacting the fields of human resource development, management and higher education. … Dr. Haynes has identified a research focus that is critical to the success of the fields of HRD and Management. … Compared to his peers in the field of HRD …, his scholarly record is above average and in my opinion, would be promoted to the rank of Associate Professor with tenure in my own institution.  Dkt. 96-4 at 2-3.

### E.  IST DEPARTMENT REVIEW OF DR. HAYNES' APPLICATION

On September 6, 2013, the tenured faculty in the IST Department reviewed and voted on the merits of both Dr. Haynes and Dr. Cho's dossiers.    Dkt. 68-4 at 130; Dkt. 68-25.  Dr. Frank DiSilvestro presented Dr. Haynes' case, but had never presented a case for tenure prior to Dr. Haynes.  Dtk. 68-11 at 59; Dkt. 100-7.  Four of the tenured faculty voted in favor of tenure for Dr. Haynes and two voted against.  Dkt. 95-14 at 2.

The next step was the recommendation of Dr. Brush, who was the Chair of the IST Department.  Dkt. 68-11 at 104-05.  Dr. Brush noted in his recommendation that the "committee noted some areas for improvement in both research and teaching, but the majority of the faculty in IST still believe that Dr. Haynes has met the criteria for promotion and tenure at Indiana University."  Dkt. 68-26.  He concluded that "the majority vote by the primary committee indicates that Dr. Haynes has attained excellence in research and satisfactory in teaching and service.  I support the faculty recommendation to award promotion to Associate Professor with tenure to Dr. Haynes."  Dkt. 68-26.

In early November 2013, upon Dr. Alexander's request, Dr. Brush submitted revised summaries of the votes for both Dr. Cho and Dr. Haynes' tenure applications. Dkt. 68-24 at 4.  The summaries were approved by all IST Department members and

000017

were added to the dossiers of each candidate.  Dkt 68-14 at 153-54, 157-58, 162, 212; Dkt. 68-27; Dkt. 68-24 at 4.

### F.  SCHOOL OF EDUCATION'S REVIEW OF DR. HAYNES' APPLICATION

In early October 2013, Dr. Haynes' dossier was reviewed and voted on by members of the School of Education Promotion, Tenure, and Contracts Committee (the "School Committee").  Dkt. 68-26 at 3.  The School Committee chose Dr. Krista Glazewski to present Dr. Haynes' case.  Dkt. 102-5 at 39.  Dr. Glazewski admitted that she was not "at all" familiar with Dr. Haynes' specialty.  Dkt. 96-11 at 1.  The School Committee voted six against and three for granting tenure to Dr. Haynes.  Dkt. 68-29.

On October 22, 2013, the School Committee prepared a written memorandum of its findings and submitted it to the Dean of the School of Education, Gerardo Gonzalez. Dkt. 68-29 at 1.  The memorandum noted that, with respect to research, the School Committee voted six to three against tenure and stated, "Dr. Haynes has published eight peer-reviewed publications (five as first author) and three book chapters" but also "questioned the extent of Dr. Haynes's impact based on low citation numbers and low numbers of publications in high-quality journals."  Dkt. 68-29 at 5-6, 9.  The School committee had the same vote with respect to teaching, noting that "Dr. Haynes's teaching evaluations have been mixed, and particularly low in the online courses."  Dkt. 68-29 at 6-7.  The School Committee further explained that "his evaluations have not shown significant improvement over the years and comments from some students indicated that Dr. Haynes sometimes is unresponsive to emails and questions about course

9

000018

assignments." Dkt. 68-29 at 7. Finally, the School Committee gave Dr. Haynes a satisfactory rating in service. Dkt. 68-29 at 8. [2]

On November 20, 2013, after conducting his own independent review, Dean Gonzalez prepared a detailed written summary of his findings and recommended against granting Dr. Haynes tenure. Dkt. 68-31. Dean Gonzalez concluded that Dr. Haynes did not satisfy the criteria for tenure in research and teaching. Dkt. 68-3 at 193; Dkt. 68-31.

## G.  DR. HAYNES' REBUTTAL EVIDENCE

On November 20, 2013, Dr. Alexander drafted the initial letter from Dean Gonzalez to Dr. Haynes denying him tenure and requested that Dean Gonzalez edit it. Dkt. 96-51. Dean Gonzalez replied on November 26, 2013, "Sorry for the delay in getting back to you on this one. I've really had to think about it, but in the end I just had to agree with the majority of the School's Committee. … Let's hold it as long as we can to see if anything new emerges." Dkt. 97-18 at 1. On December 10, 2013, Dean Gonzalez informed Dr. Haynes that he and the School Committee voted against his tenure. Dkt. 97-19.

Following the denial, Dr. Haynes submitted a 47-page document titled "Additional Information Related to Research & Teaching" to explain why "the negative review was

---

[2] Dr. Haynes cites to a prior memorandum drafted by the School Committee on October 8, 2013, but fails to provide any significance for mentioning it. Dr. Haynes claims that Dr. Glazewski "fundamentally altered the [School Committee]'s report, changing the vast majority of its positive statements to negative or neutral statements." Dkt. 94 at 13. Dr. Haynes also notes that the votes changed between the drafts of the report, noting that the vote was "1 excellent to 8 very good for research but changed by the final draft to 3 excellent, 5 very good/highly satisfactory, and 1 satisfactory; and Haynes's teaching … was reversed from 6 votes for satisfactory and 3 votes for unsatisfactory to 3 votes for satisfactory and 6 votes for unsatisfactory." Dkt. 94 at 13. Dr. Haynes fails, however, to demonstrate any import that these changes had on his case, since it would appear that the reason for his tenure denial, his research, was given a greater assessment in the final memorandum.

000019

erroneous." Dkt. 68-12 at 189-93. He also submitted a second 15-page document to specifically address his teaching. Dkt. 68-12 at 200-01. Dr. Alexander advised Dr. Haynes that the earlier reviewers would receive any supplemental information to his dossier and would have the opportunity to change their vote. Dkt. 68-13, Ex. 13. The Department and the School Committee members received the new information for consideration, but none of them changed their votes as a result of the supplemental materials. Dkt. 68-24 at 4.

### H. UNIVERSITY REVIEW

Following Dean Gonzalez's negative recommendation, the University-wide Tenure Advisory Committee ("Tenure Committee"), headed by Vice Provost for Faculty and Academic Affairs Thomas Gieryn, reviewed Dr. Haynes' dossier. Dkt. 68-32. All nine members of the Tenure Committee voted against granting Dr. Haynes tenure. Dkt. 68-32 at 2. The Tenure Committee noted that Dr. Haynes' case was "presented on the basis of excellence in research," but none of them found that Dr. Haynes' research reached that level (votes on research: 3 very good, 4 satisfactory, and 2 unsatisfactory). Dkt. 68-32 at 2. Moreover, eight of the nine members on the committee found Dr. Haynes' teaching to be ineffective. Dkt. 68-32 at 2.

Next, Gieryn himself reviewed Dr. Haynes' dossier. Dkt. 68-12 at 19; Dkt. 98-33 at 2-3. Gieryn concentrated his evaluation on Dr. Haynes' research. Dkt. 68-34 at 2. Gieryn noted that "it is impossible to conclude that [Dr. Haynes'] research meets the standard of Excellence. Pooling all votes and recommendations together, 18/26 people evaluate the research as less than Excellent." Dkt. 68-34 at 2. Geiryn noted, "Concerns about the quantity of peer-reviewed publications, the stature of journals where they are

11

000020

published and their demonstrated impact/influence are raised in the external letters and continue at every level of review." Dkt. 68-34 at 2. After reviewing Dr. Haynes' dossier and the reports from the external reviewers, Gieryn concluded, "I evaluate the candidates' research to be Very Good, falling short of the Excellence needed for a positive tenure and promotion decision." Dkt. 68-34 at 3.

In a letter dated March 26, 2014, Gieryn wrote to Dr. Haynes to inform him that his tenure was not recommended to the Board of Trustees and that his appointment would end May 2015. Dkt. 68-35 at 2. Gieryn stated, "President McRobbie, Provost Robel and I relied heavily on reviews prepared by faculty committees and also on the opinions of administrators who evaluated your dossier." Dkt. 68-35 at 2.

## I. GRIEVANCE

On May 27, 2014, Dr. Haynes submitted a 104-page grievance with an attached 43-page appendix to the Faculty Board of Review ("Review Board"). Dkt. 68-37 at 3. The Review Board "decide[s] whether evidence supports the conclusion that procedural irregularities had consequences for the legitimacy of the outcome, and if so, they may make suggestions for remediation to the Provost." Dkt. 68-20 at 2. Dr. Haynes did not indicate anywhere in his grievance that his race played a role in the decision to deny him tenure. Dkt. 68-13 at 2.

In an August 4, 2014, memorandum, the Review Board discussed each of Dr. Haynes' alleged grievances and concluded that none had merit. Dkt. 68-38. On August 19, 2014, Dr. Haynes submitted a response to the Review Board's findings titled "Corrections to Matters of Fact," but the submission did not change the recommendation of the Review Board. Dkt. 68-39; Dkt. 68-37 at 3.

000021

On September 22, 2014, Dr. Haynes was notified that Provost Robel accepted the Review Board's decision and recommendation and therefore no further action would be taken with respect to his grievance. Dkt. 68-37 at 3.

### J. APPEAL TO UNIVERSITY'S PRESIDENT

On March 17, 2015, Dr. Haynes submitted an appeal to President Michael McRobbie and for the first time alleged that his denial of tenure was a result of racial discrimination. Dkt. 68-41. President McRobbie denied Dr. Haynes' appeal and Dr. Haynes' appointment with the University ended in May 2015. Dkt. 68-13 at 6; Dkt. 68-35.

### K. DRS. CHO AND LEFTWICH

Dr. Yonjoo Cho, who is not African American, had more publications than Dr. Haynes and received a unanimous vote for tenure at all levels of review.[3]

Dr. Anne Leftwich, who is not African American, had sixteen publications listed on her dossier presented for tenure but only four were independent of her mentors at Indiana or Purdue University. Dkt. 99-16 at 85-92. One of Dr. Leftwich's external reviewers found that "[g]iven that so few of her publications to date are singly authored, it is difficult to determine whether Dr. Leftwich's facility with collaborative research and writing with both faculty and students overshadows her unique individual contributions to educational

---

[3] Dr. Haynes claims that Dr. Cho was "less independent" than Dr. Haynes and cites to the report discussing Dr. Cho's tenure case, which states in part "that Dr. Cho had numerous publications that were more focused on summarizing research of other scholars and promoting 'models' that lacked much empirical foundation." Dkt. 99-7 at 6. The report concluded, however, that "the overall view of the faculty regarding Dr. Cho's research productivity and scholarship was highly positive and as the discussion concluded, the faculty seemed to be in consensus that Dr. Cho's work to date merited an excellent rating." Dkt. 99-7 at 6. Dr. Haynes also broadly claims that Dr. Cho received "negative teaching evaluations" that were glossed over at all levels of review, but fails to provide any analysis in this regard and therefore this unsupported allegation is disregarded.

000022

technology research." Dkt. 99-16 at 55. The same reviewer concluded, however, that her "review of Dr. Leftwich's work suggests that it is methodologically sound and well-triangulated, well-grounded in existing literature, clearly communicated, and useful to other researchers in application of its findings." Dkt. 99-16 at 55. Dr. Lefwich received a unanimous vote for tenure at all levels of review. Dkt. 99-16 at 1.

## M.  CHARGE OF DISCRIMINATION AND LAWSUIT

On April 10, 2015, Dr. Haynes filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Dkt. 1-1. He then filed this lawsuit on October 29, 2015. Dkt. 1. The Complaint alleges race discrimination under Title VII, race discrimination pursuant to 42 U.S.C. § 1981, and breach of implied covenant of good faith and fair dealing.[4] Dkt. 1.

## II.  <u>SUMMARY JUDGMENT STANDARD</u>

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(a), which provides in relevant part: The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

---

[4] In his Statement of Claims, Dr. Haynes stated that he will not be pursuing his claim related to a breach of the implied duty of good faith and fair dealing at trial. Dkt. 116 at 4. Therefore, the Court will only address Dr. Haynes' discrimination claims.

14

000023

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials showing that a fact either is or cannot be genuinely disputed. Fed.R.Civ.P. 56(c)(1).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir.1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying applicable evidence. *See Bombard v. Ft. Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir.1996).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir.1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir.1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992). If the moving party does not have the ultimate burden of proof on a claim, it is sufficient for the moving party to direct the court to the lack of evidence as to an element of that

15

claim. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir.1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir.1996).

### III.  **DISCUSSION**

### A.  **COLLATERAL MOTIONS**

Prior to addressing the merits of Dr. Haynes' discrimination claims, the Court must first address four pending issues: (1) Defendants' Motion to Strike (Dkt. 117); (2) Dr. Haynes' Surreply Motion (Dkt. 148); (3) Dr. Haynes' Surreply in Opposition to Defendants' Motion for Summary Judgment and Motion to Strike ("Surreply in Opposition") (Dkt. 160); and (4) Dr. Haynes' Motion to Reconsider (Dkt. 165).

### 1.  **Motion to Strike**

Pursuant to Federal Rule of Evidence 702, Defendants have moved to strike the declaration of Dr. Laura W. Perna (Dkt. 102-14), which Dr. Haynes attached to his response to Defendants' motion for summary judgment.  Defendants do not challenge Dr. Perna's credentials, but rather claim that her opinions are inadmissible.

In her declaration, Dr. Perna states that she "was engaged as an independent expert to evaluate whether Dr. Haynes's tenure process involved any procedural irregularities and to compare his qualifications for tenure with that of [Dr. Leftwich]."  Dkt. 102-14 at 3.  Dr. Perna concluded in her declaration that "[Dr.] Haynes' research record is at least comparable to that of [Dr. Leftwich].  If [Dr. Leftwich]'s record demonstrated 'excellence' in research, then so does the record of [Dr.] Haynes."  Dkt. 102-14 at 4.  Dr. Perna also concluded "that various aspects of the promotion and tenure process were not

16

000025

appropriately executed for [Dr.] Haynes. Particularly problematic is the selection of his external reviewers." Dkt. 102-14 at 4.[5]

With respect to her conclusion that Dr. Haynes' research was at least comparable to Dr. Leftwich, Dr. Perna did a "comparative assessment of research excellence." Dkt. 102-14 at 5. This assessment considered the quantity of material produced by both Dr. Haynes and Dr. Leftwich and considered the number of: (1) peer-reviewed journals; (2) independent lines of research; (3) research as books, book chapters, and conference presentations; and (4) peer-reviewed journal articles. Dkt. 102-14 at 5-7. Dr. Perna also noted that both Dr. Haynes and Dr. Leftwich received awards for papers and had research entered into journals with high impact factors. Dkt. 102-14 at 6. Finally, Dr. Perna summarized the amount of grants each procured and whether they did so independently or as part of a collaboration. Dkt. 102-14 at 6-7.

Dr. Perna also reviewed various aspects of Dr. Haynes' external review. She first noted that the "Vice Provost's Tenure and Promotion Recommendation raises questions about 'the probative value of the external letters[,]'" noting that it was not Dr. Haynes' responsibility to secure qualified reviewers and Bichelmeyer stated in an email that she "dropped the ball on external reviewers for Ray."[6] Dkt. 102-14 at 7. Dr. Perna also concluded that Dr. Brush "failed to encourage Haynes to select reviewers who are at different institutions," citing an email from Dr. Brush to Dr. Haynes recommending

---

[5] In the attached exhibit to Dr. Perna's declaration, which sets out more fully the evidence considered in making her declaration, Dr. Perna succinctly reviewed Dr. Haynes' teaching performance. She does not, however, in either her declaration or the attached exhibit, provide a conclusion for her analysis or tie it in to her declaration. *See* dkt. 102-14 at 8-9. Accordingly, it will not be considered in the Court's analysis.

[6] The actual email passage states that Bichelmeyer "dropped the ball on external reviewers for Ray *and Yonjoo.*" Dkt. 100-13 at 1 (emphasis added).

17

professors that are part of strong programs and who have strong academic credentials despite not being peer institutions.   Dkt. 102-14 at 7.   Dr. Perna then states that "[a]vailable evidence raises questions about the qualifications of external reviewers that Joyce Alexander selected as external reviewers" and cites to various emails from Dr. Alexander to potential external reviewers who believed themselves either unqualified to render an opinion on Dr. Haynes' specialty or no longer active in the field.   Dkt. 102-14 at 7-8.   Dr. Perna also took issue with "why [Dr. Hardre] was selected" as an external reviewer, noting one member of the faculty group's opinion that Dr. Hardre tended toward hyperbole and did not know much about Dr. Haynes' area of specialization.   Dkt. 102-14 at 8.   Finally, Dr. Perna took issue with Dean Gonzalez's characterization of Drs. Branch and Nafukho's external reviews as a "mixed assessment[,]" claiming that both of the doctors provided a positive review of Dr. Haynes' dossier.   Dkt. 102-14 at 8.

Before proceeding to the merits, the Court must address two contentions raised by Dr. Haynes.   Dr. Haynes first claims that the Defendants' Motion to Strike is procedurally improper pursuant to Local Rule 56-1(i), which states, "The court disfavors collateral motions – such as motions to strike – in the summary judgment process.   Any dispute over the admissibility or effect of evidence must be raised through an objection within a party's brief."   Although motions to strike are typically disfavored, Defendants adequately raised their objection in their reply brief and filed their Motion to Strike on the same day. *See* dkt. 120 at 3 n.3.   Accordingly, the Court finds no error.

Dr. Haynes also claims that Defendants are required to show prejudice in filing a motion to strike, citing Rule 12(f).   Dkt. 139 at 4-5.   Rule 12(f) states that "the court may strike from a pleading any … redundant, immaterial, impertinent, or scandalous matter."

18

000027

Defendants' Motion to Strike, however, is not predicated on any of these grounds; it seeks to preclude inadmissible testimony from Dr. Haynes' expert. Therefore, this argument is without merit.

Defendants claim that Dr. Perna's opinions are both unreliable and irrelevant and therefore fail to meet the admissibility standard for expert testimony. Dkt. 117 at 2. Rule 702 states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court follows a two-prong framework: the Court must determine whether "(1) the proposed witness would testify to valid scientific, technical, or other specialized knowledge[,] and (2) [whether] his testimony will assist the trier of fact." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (quotations and citations omitted). "Expert testimony which does not relate to any issue in the case is not relevant[.]" *Daubert*, 509 U.S. at 591 (citations and quotation marks omitted).

The proponent of the expert testimony bears the burden of establishing the admissibility of the expert opinion by a preponderance of the evidence. *Daubert*, 509 U.S. at 592. "The principles set forth in *Daubert*, which addressed scientific testimony, apply equally to non-scientific fields." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 805-06 (7th Cir. 2013) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999)). Regardless of the nature of the witness' expertise, Rule 702: (1) establishes a

000028

standard of evidentiary reliability; (2) requires a valid connection to the pertinent inquiry as a precondition to admissibility; and (3) mandates that the testimony have a reliable basis in the knowledge and experience of the relevant discipline. *Id.*

Defendants first claim that Dr. Perna's comparison of Dr. Leftwich's research credentials is irrelevant to the material aspects of this case. Dr. Haynes responds that "Dr. Perna's testimony goes to the heart of the determination of whether Dr. Haynes was treated differently than other similarly situated tenure candidates." Dkt. 139 at 13. Dr. Perna readily admits in her declaration that she is "not an expert in Dr. Haynes' content area," which might explain why Dr. Perna only compares the quantity, rather than the quality, of the research done by both Dr. Haynes and Dr. Leftwich. Dkt. 102-14 at 5. But simply counting the amount of works by each candidate is not something that necessitates an expert's "specialized knowledge." Fed. R. Evid. 702. Dr. Perna offers no substantive analysis in her review of either candidate's work and makes the assumption that the two candidates were equally qualified based on the number of works generated, despite Dr. Perna's own acknowledgement that the University has emphasized "[q]uality of production is considered more important than mere quantity." Dkt. 102-14 at 5-6. The Guidelines state: "Evaluations of research can never be reduced to a simple metric: judgments about the quality of work, and its influence, impact, utility and creativity cannot be fully captured by the count of publications and citations or by a journal impact fact." Dkt. 97-12 at 6. They further state, "Faculty members and administrators must fully engage the candidate's work, and reach their own judgments about its worth." Dt. 97-12 at 6. Pursuant to the Guidelines, simply counting the number of work between the two candidates is not enough to provide an accurate analysis. Dr.

20

000029

Perna's report does nothing to evaluate the quality of works as between Dr. Haynes and Dr. Leftwich and therefore is neither relevant nor "assist[s] the trier of fact" in making a comparison of the candidates' qualifications. *Ammons*, 368 F.3d at 816.

Dr. Perna's opinion on the external reviewers suffers the same fate.[7] Dr. Perna's report states that "various aspects of the promotion and tenure process were not appropriately executed for Haynes. Particularly problematic is the selection of his external reviewers." Dkt. 102-14. To render this conclusion, Dr. Perna critiques various emails and reports submitted with Dr. Haynes' tenure, but fails to draw on any "specialized knowledge" that would be useful to a trier of fact. Fed. R. Evid. 702. Dr. Perna's opinions offer nothing that a jury could not comprehend on its own. The purpose of expert testimony is to help the jury with "issues that laypeople would have difficulty resolving on their own." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). Although Dr. Perna has "participated in or consulted on approximately 100 tenure reviews at multiple universities[,]" she uses none of this knowledge in reaching her conclusions and contributes nothing new to the analysis. Dkt. 102-14 at 3. Laypeople are well-equipped to evaluate this evidence to determine whether Dr. Haynes' tenure process was done properly. Dr. Perna's testimony related to the external reviewers is irrelevant.

Accordingly, Defendants' Motion to Strike is **GRANTED**.

### 2. **Surreply Motion**

Dr. Haynes filed his Surreply Motion seeking to reply to Defendants' allegedly new argument that "Dr. Perna as a witness should be excluded at summary judgment and

---

[7] The Court notes that the Defendants sought to strike Dr. Perna's opinion on the selection of external reviewers as unreliable.

000030

trial." Dkt. 148 at 1-2.  Dr. Haynes claims that the Defendants' assertion that Dr. Perna should be excluded as a witness at trial is a new argument to which they should be entitled to respond.  Because Dr. Haynes' claims fail on the merits, *see infra* pt. III, B, his Surreply Motion is **DENIED as MOOT**.

### 3.  Surreply in Opposition

On July 31, 2017, the Court issued an order allowing Dr. Haynes to submit a surreply to respond to: (1) new allegations in Defendants' counsel's affidavit; and (2) Defendants' argument on qualified immunity.  Dkt. 157.  The Court admonished Dr. Haynes that "any evidence in the surreply must be limited to the affidavit and the qualified immunity arguments and any extraneous evidence will be stricken completely."  Dkt. 157 at 8.  The Court accepts the argument on Defendants' claim that Dr. Haynes' case is time barred as well as the evidence designated by Dr. Haynes in support of his surreply as to Defendants' counsel's affidavit, which consists of a declaration made by Dr. Haynes.  Dkt. 161-4.

With respect to the qualified immunity argument, Dr. Haynes once again takes the opportunity to try and admit the full expert reports of Drs. Greenwald and Perna.  *See* dkts. 131, 132.  "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (citation and quotation marks omitted).  "The doctrine of qualified immunity shields from liability public officials who perform discretionary duties." *Chelios v. Heavner*, 520 F.3d 678, 690-91 (7th Cir. 2008)  "The defense provides 'ample room for mistaken judgments' and protects all but the 'plainly incompetent and

000031

those who knowingly violate the law.'"  *Id.* at 690 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

Dr. Haynes first offers the expert opinion of Dr. Perna, which concludes that "Dr. Haynes' record did not receive a fair and substantive evaluation on its academic merits. Instead, the tenure and promotion process for Dr. Haynes was executed in a way that seemingly pre-determined the result to deny tenure to Dr. Haynes."  Dkt. 161-2 at 22-23. Dr. Haynes cites to Dr. Perna's full expert report to claim that "[e]ach individual Defendant was involved in sabotaging Dr. Haynes's tenure application and thus violated the law." Dkt. 160 at 13.  But nothing in Dr. Perna's report sets forth any indication that any individuals "knowingly violate[d] the law."  *Chelios*, 520 F.3d at 690.  Dr. Perna's full expert report merely points out irregularities during Dr. Haynes' tenure review that she deems "improper" and "problematic."  Dkt. 160 at 13-14.  These observations, in addition to being irrelevant, *see supra* pt. III, A, 1, do not relate to whether or not any of the individual Defendants knowingly violated Dr. Haynes' constitutional rights and, pursuant to this Court's July 31, 2017, Order, are hereby stricken.  Dkt. 161-2

Dr. Haynes also proffers Dr. Greenwald's full expert testimony to establish that the "individual Defendants' denial of Haynes's tenure application was, at minimum, plainly incompetent because the individual Defendants' implicit bias affected their tenure decision against Haynes."  Dkt. 160 at 17.  Dr. Haynes fails, however, to explain how any implicit bias by the individual Defendants could render their actions "plainly incompetent." If anything, this type of bias would be protected under the qualified immunity doctrine, which "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate

23

the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks and citation omitted). Thus, Dr. Greenwald's expert report fails to address Defendants' qualified immunity argument and, pursuant to this Court's July 31, 2017, Order, is hereby stricken.

### 4. <u>Motion to Reconsider</u>

On August 11, 2017, Dr. Haynes filed his Motion to Reconsider pursuant to Rule 60. Dkt. 165. "Motions to reconsider serve a limited function, to be used 'where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension.'" *Davis v. Carmel Clay Sch.*, 286 F.R.D 411, 412 (S.D. Ind. 2012) (quoting *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990)) (additional quotations omitted). The Court may grant a motion to reconsider if a movant demonstrates a manifest error of law or fact, but a motion to reconsider is not to be used to make new arguments. *See In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996).

Dr. Haynes makes the following requests in his Motion to Reconsider: (1) reconsider the denial of Dr. Haynes' request to supplement the record with expert testimony; (2) permit the use of Dkt. 131-1, which the Court excluded for Dr. Haynes' failure to cite it in his brief; (3) allow Dr. Haynes to respond to Defendants' cat's paw theory; (4) consider evidence regarding the gender of one of the professors listed in an affidavit; and (5) admit Dr. Haynes' expert reports to respond to Defendants' qualified immunity arguments.

Dr. Haynes first blames the Court for his own failure to timely gather expert testimony to respond to Defendants' Motion for Summary Judgment. Dr. Haynes claims

000033

that "the constricted briefing timeline set by the Court prevented Dr. Haynes from using his expert reports in his response." Dkt. 165 at 6. Yet, as the Court made clear in its July 31, 2017, Order denying his Motion to Supplement, Dr. Haynes failed to timely raise this issue with the Court or request additional time to respond to Defendants' Motion for Summary Judgment, which resulted in the predicament he now faces. Dkt. 157 at 6-7. Rather than take the "it's easier to ask forgiveness than permission" approach, Dr. Haynes should have informed the Court, and the Defendants, of the need for more time to gather his expert testimony so that the issue could be addressed in a timely manner, but he failed to do so. Accordingly, his request to reconsider the Court's prior decision on this issue is **DENIED**.

Dr. Haynes then claims that his Motion to Supplement "simply sought to add [Dkt. 131-1] that was missing from his Designation of Evidence." Dkt. 157 at 9. Dr. Haynes states that he "was not aware that he needed to provide a pinpoint cite in his Response to the location of a citation to an exhibit in a prior brief that had been inadvertently omitted from his Designation of Evidence." Dkt. 165 at 9. Although it is not a requirement for a party to provide such a pinpoint cite, it would behoove Dr. Haynes to point out what part of the 15 pages of evidence contained in Dkt. 131-1 that is relevant to his discrimination claim and also inform the Court where such evidence is cited in his 37-page response brief. Nonetheless, the Court will accept this email chain as evidence on the merits of Dr. Haynes' claims. The Court reminds Dr. Haynes that it is not required to "hunt[] for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

Dr. Haynes next cites the "cat's paw" argument raised in his Motion for Surreply. Dkt. 165 at 10-12. Dr. Haynes makes the same arguments in his Motion to Reconsider

25

000034

that the Court rejected in its July 31, 2017 Order.  Dr. Haynes has failed to present any manifest error of law or fact and, therefore, this argument is rejected.

Dr. Haynes also claims that he "discovered that Defendants' offered affidavit from Jane Kaho was misleading." Dkt. 165 at 12.  Dr. Haynes notes that Kaho's affidavit, which relayed information on the number of African Americans at the School of Education, did not indicate the gender of each faculty member.  Dr. Haynes notes a discrepancy with one of the individuals he believed to be a male, but who is actually a female.  Dr. Haynes also points out that one African American male on Kaho's affidavit "belongs to the Indianapolis campus, not the Bloomington campus." Dkt. 165 at 13.  Dr. Haynes tenders this information to bolster his statement that "**no** tenured African American male is employed at the Indiana University School of Education in Bloomington." Dkt. 165 at 13. The Court is unclear how this statement assists it to evaluate his race discrimination claims, since there are no allegations of gender discrimination.  Nonetheless, the Court accepts this new information.

Finally, Dr. Haynes claims that the Court's July 31, 2017, Order contained a factual error; namely, the Court failed to recognize that the reports of Drs. Perna and Greenwald were used to respond to Defendants' qualified immunity defense.  The Court has already addressed this argument above.  *See* pt. III, A, 3.  Dr. Haynes' submission of the full expert reports of Drs. Perna and Greenwald does not comport with the Court's July 31, 2017 Order and they will not be considered.

For the reasons set forth above, Dr. Haynes' Motion to Reconsider is **GRANTED in part and DENIED in part**.

000035

## B. EQUITABLE TOLLING

In Indiana, a plaintiff must file a charge of discrimination "within 300 days of the occurrence of the act that is the basis of the complaint." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994). Failure to file within the 300 days renders the claim "time-barred" and precludes recovery. *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007). "The 300-day limit … begins to run when the defendant has taken the action that injures the plaintiff and when the plaintiff knows [he] has been injured … not when [he] determines that the injury was unlawful." *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001) (quotation marks and citations omitted).

Dr. Haynes filed his charge of discrimination on April 10, 2015, approximately 380 days after he was notified of the University's decision not to grant him tenure. Dkt. 1-1. Dr. Haynes argues that his claim should survive under the theory of equitable tolling. "Equitable tolling may only extend a deadline when 'despite all due diligence, a plaintiff cannot obtain the information necessary to realize that he may possibly have a claim.'" *Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010) (quoting *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 860 (7th Cir. 2005)). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Even when equitable tolling is applicable, "the court does not grant the plaintiff a fresh 300 days to file his charge once he obtains enough information to suspect discrimination; he must file his charge with the EEOC within a reasonable time." *Thelen v. Marc's Big Boy Corp.*, 64F.3d 264, 268 (7th Cir. 1995).

27

Dr. Haynes claims that he was not reasonably aware of his discrimination claim until March 2015, and therefore he only waited for a few weeks before submitting his charge of discrimination with the EEOC.  He asserts that the information he received in March 2015 following a Freedom of Information Act request contained "key documents" that provided evidence of discrimination based on Haynes' race.  Dkt. 94 at 18.  He specifically admits in his Complaint, however, that "on or around October 24, 2014, was the first time that Dr. Haynes suspected or was aware of racial discrimination against him."  Dkt. 1, ¶ 64. [8]  "Judicial admissions are formal concessions in the pleadings, or stipulations by the party or its counsel, that are binding upon the party making them." *Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995).  Dr. Haynes' own Complaint explicitly acknowledges that he learned of the alleged discriminatory acts that formed the basis of his Complaint in October 2014.

Dr. Haynes' assertion that the "key documents" provided in March 2015 provided him the information necessary to put the pieces together is baseless.  Tellingly, the evidence cited by Dr. Haynes does nothing to establish any discriminatory intent by the Defendants.  He cites: (1) an email from Brush to Boling and Bichelmeyer that suggested he did not fit in with the IST Department; (2) additional emails where Boling and/or Glazewski talked negatively about Haynes behind his back with Tom Brush; and (3) email

---

[8] In his surreply, Dr. Haynes states that the reason that he stated that October 24, 2014, was the first day he suspected racism is because that is when he received his first batch of documents and that he wrote that date on the emails that date when he received them. Dkt. 161-4, ¶¶ 5-6.  Dr. Haynes could have stated in his Complaint that this is when he first began to receive documents from the University relating to his FOIA request, which the University concedes, but chose not to.  In fact, October 24, 2014, was the first date that the University produced documents relating to his claim.  This explanation does nothing to refute the explicit statement in his Complaint as to when he gained knowledge of his alleged claims and is therefore disregarded.

28

exchanges between James Klein and Brush showing that Brush was improperly speaking directly with his proposed external reviewer about what he thought Haynes' external review should say.  Dkt. 94 at 18.[9]  Dr. Haynes claims that only after receiving this information in March 2015 did he "finally underst[and] that he had been discriminated against on the basis of his race, African American."  Dkt. 94 at 18.  Yet none of the information cited by Dr. Haynes provides any indication of discriminatory animus during his tenure process or provides the "extraordinary circumstance" that he finally overcame to discover that he had been discriminated against.  *Pace*, 544 U.S. at 418.  Having failed to meet this burden, Dr. Haynes' equitable tolling argument must fail and his Complaint is untimely as a matter of law.

## C.  DISCRIMINATION CLAIMS

Even if the Court could conclude that Dr. Haynes is entitled to equitable tolling and find that his claims, which are brought under both Title VII and 42 U.S.C. § 1981, are not time barred, they fail as a matter of law on the merits.

Courts "generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) (citations omitted).  Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]"  42 U.S.C. § 2000e-2(a)(1).  To establish a claim under Title VII, a "plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal

---

[9] Dr. Haynes did not provide citations for the first two email exchanges.

000038

link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

As the Seventh Circuit recently instructed, a claim may survive summary judgment if "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race … caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court need not separate direct and indirect evidence into separate legal standards. *Id.* *Ortiz*, however, did not alter the burden-shifting framework set forth by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See David v. Bd. of Trs. of Cmty Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Notably, with respect to tenure decisions, "although the legal standard is the same whether the plaintiff in an employment discrimination case is a salesman or a scientist, practical considerations make a challenge to the denial of tenure at the college or university level an uphill fight." *Blasdel v. Northwestern Univ.*, 987 F.3d 813, 815 (7th Cir. 2012). This uphill fight is due to "the absence of fixed objective criteria for tenure at that level." *Id.* Even so, "faculty votes should not be permitted to camouflage discrimination, even the unconscious discrimination of well-meaning and established scholars." *Namenwirth v. Bd. of Regents of Univ. of Wisc. Sys.*, 769 F.2d 1235, 1243 (7th Cir. 1985). However, "'in the absence of clear discrimination,' [courts] are generally 'reluctant to review the merits of tenure decisions,' recognizing that 'scholars are in the best position to make the highly subjective judgments related to the review of scholarship and university service.'" *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007) (citing *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th. Cir. 2005)).

000039

Since Dr. Haynes has not introduced any direct evidence that the Defendants discriminated against him because of his race, he presents his case under the indirect, burden-shifting method under the *McDonnell Douglas* framework.  To satisfy the first step of this analysis, "the plaintiff must establish a *prima facie* case of discrimination."  *Rhodes v. Ill. Dep't Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), *abrogated on other grounds by, Ortiz*, 834 F.3d 760.  To do so, Dr. Haynes must demonstrate that he: (1) is a member of a protected class; (2) was performing his job satisfactorily; (3) experienced an adverse employment action; and (4) similarly situated individuals were treated more favorably.  *Id.* If the plaintiff satisfies this initial burden, the burden shifts to the employer to produce "a legitimate, non-discriminatory reason for its employment action, and in response the plaintiff must prove that the employer's proffered non-discriminatory reason is a pretext for discrimination."  *Id.* Defendants do not dispute that Dr. Haynes satisfies the first and third prongs; therefore, the Court focuses its analysis on the second and fourth prongs.

### 1. *Prima Facie* Case

Dr. Haynes attempts to establish his *prima facie* case for race discrimination by showing that he was qualified for tenure and that Dr. Leftwich was a similarly situated non-African American who received tenure the year before Dr. Haynes.  The only evidence proffered by Dr. Haynes for this suggestion, however, is Dr. Perna's declaration, which concludes that "Haynes' research record is at least comparable to that of [Leftwich]."  If [Leftwich]'s record demonstrated 'excellence' in research, then so does the record of Haynes."  Dkt. 102-14 at 4.  The Court has already determine that this evidence is inadmissible.  *See supra* pt. III, A, 1.

31

000040

Even accepting that Dr. Perna's assessment that Dr. Haynes' dossier was comparable to Dr. Leftwich's, however, does not aid the Court in finding a discriminatory purpose; "because tenure decisions typically involve numerous layers of review by independent and University-wide committees, the causal connection between possible discriminatory motive of a subordinate participant in the tenure process and the ultimate tenure decision is weak or nonexistent." *Adelman-Reyes*, 500 F.3d at 667 (quotation marks and citation omitted). "Given the nuanced nature of [tenure] decisions, we generally do not 'second-guess the expert decisions of faculty committees.'" *Sun v. Bd. of Trs. of the Univ. of Ill.*, 473 F.3d 799, 815 (7th Cir. 2007) (quoting *Vanasco v. Nat'l Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998). Eight other faculty members voted to grant Dr. Haynes tenure based on his dossier; 19 voted against. The fact that Dr. Perna holds a different opinion on Dr. Haynes' research than 19 of Dr. Haynes' colleagues does little to benefit this case "in the absence of clear discrimination." *Farrell*, 421 F.3d at 616. Dr. Perna's declaration provides no indication that the other 19 faculty members' votes were made in error, much less any indication that the votes were cast with discriminatory intent. And, as explained more fully above, simply counting the number of publications is insufficient. *See supra* pt. III, A, 1. Thus, Dr. Haynes has failed to establish that he was qualified for tenure and his *prima facie* case must fail.

## 2. **Pretext**

Even if Dr. Haynes could establish a *prima facie* case for discrimination, the Defendants have articulated a non-discriminatory reason for denying him tenure that is not pretextual. Multiple individuals and groups reviewed Dr. Haynes' dossier and the majority found that Dr. Haynes' research did not rise to the University's standard of

32

excellence. To establish "that an employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that the employer made a mistake or that the employer's reason was not good enough to support its decision. … Instead, the plaintiff must demonstrate that the employer's reason is unworthy of belief." *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 677 (7th Cir. 2002) (citations omitted). "Specifically, the plaintiff must show that the 'nondiscriminatory' reason is not the real reason at all, but is instead nothing but a cover-up for discrimination." *Id.* (citing *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)). To demonstrate this, Dr. Haynes may show that: "(1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the discharge; or (3) the proffered reasons were insufficient to motivate the discharge." *Wolf*, 77 F.3d at 914.

Dr. Haynes offers two arguments that this decision was pretextual: (1) Dr. Haynes was held to a stricter standard than Drs. Cho and Leftwich; and (2) numerous irregularities occurred during his tenure review process.[10] For the former contention, Dr. Haynes merely concludes that, because Dr. Perna found Dr. Haynes' research on par with Dr. Leftwich, Dr. Haynes' tenure review must have been held to a stricter standard. But even

---

[10] Dr. Haynes also claims that racial discrimination may be inferred because "[i]n over 100 years, no other African American male has ever received tenure from IU's School of Education, suggesting a bias against African American males like Haynes. This shows a disparate impact." Dkt. 94 at 32. Dr. Haynes fails to develop his disparate impact theory in any way; rather he merely cites to more alleged irregularities in his tenure review process, which fails to establish how these irregularities are consequential to his discrimination or disparate impact claims. *See* dkt. 94 at 32-34. Moreover, Dr. Haynes fails to cite any authority for this line of reasoning. Accordingly, Dr. Haynes' undeveloped argument is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

33

000042

accepting that Dr. Haynes was held to a stricter standard does not establish that the reason for doing so was discriminatory.

Similarly, Dr. Haynes' claim that "numerous irregularities occurred" during his tenure process is not enough to demonstrate pretext. Dr. Haynes once again cites the inadmissible opinion of Dr. Perna who concluded that "various aspects of the promotion and tenure process were not appropriately executed for Haynes," and "[p]artiularly problematic is the selection of his external reviewers." Dkt. 102-14 at 4. But even accepting this conclusory allegation as true, Dr. Haynes has failed to demonstrate that his tenure review suffered these irregularities because he was African American. Despite Dr. Haynes setting forth a litany of alleged irregularities during his tenure review process, *see* dkt. 94 at 26-31, he is unable to show how any of these irregularities serves as "a cover-up for discrimination." *Koski*, 307 F.3d at 677. Simply put, Dr. Haynes has failed to set forth any evidence that "would permit a reasonable factfinder to conclude that [his] race … caused the … adverse employment action." *Ortiz*, 834 F.3d at 765.

Absent any evidence to the contrary, the University's decision to deny Dr. Haynes' tenure was not done with the intent to discriminate against him because of his race. Accordingly, Dr. Haynes' discrimination claims, which are brought under both Title VII and 42 U.S.C. § 1981, fail as a matter of law.

### 3. **Qualified Immunity**

Because the Court has concluded that Dr. Haynes has failed to evidence discrimination in his tenure decision, the Court declines to address the qualified immunity arguments.

34

000043

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Strike.  Dkt. 117.  Dr. Haynes' Surreply Motion is **DENIED as MOOT**.  Further, the Court **STRIKES** the full expert reports of Drs. Perna and Greenwald submitted with Dr. Haynes' Surreply in Opposition.  Dkts. 161-2, 161-3.  Dr. Haynes' Motion to Reconsider is **GRANTED in part and DENIED in part**.  Dkt. 165.  Finally, Defendants' Motion for Summary Judgment is **GRANTED**.  Dkt. 66.

SO ORDERED this 18th day of August, 2017.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

35

000044

Distribution:

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Courtney E. Endwright
BETZ & BLEVINS
cendwright@betzadvocates.com

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Melissa A. Gardner
TAFT STETTINIUS & HOLLISTER LLP
mgardner@taftlaw.com

Michael C. Terrell
TAFT STETTINIUS & HOLLISTER LLP
mterrell@taftlaw.com

Michele Lee Richey
TAFT STETTINIUS & HOLLISTER LLP
MRichey@taftlaw.com

000045

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RAY K. HAYNES Ph.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:15-cv-01717-LJM |
| | ) | |
| INDIANA UNIVERSITY, | ) | |
| THE BOARD OF TRUSTEES OF | ) | |
| INDIANA UNIVERSITY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY OF JUDGMENT PURSUANT TO
## FEDERAL RULE OF CIVIL PROCEDURE 58

The Court, having this day made its Order directing the entry of judgment, now

enters **FINAL JUDGMENT** in favor of Defendants and against Plaintiff Dr. Ray Haynes.

Plaintiff shall take nothing by way of his Complaint and this action is hereby **DISMISSED**

**with prejudice**.

IT IS SO ORDERED this 18th day of August, 2017.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

000046

Distribution:

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Courtney E. Endwright
BETZ & BLEVINS
cendwright@betzadvocates.com

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Melissa A. Gardner
TAFT STETTINIUS & HOLLISTER LLP
mgardner@taftlaw.com

Michael C. Terrell
TAFT STETTINIUS & HOLLISTER LLP
mterrell@taftlaw.com

Michele Lee Richey
TAFT STETTINIUS & HOLLISTER LLP
MRichey@taftlaw.com

# CERTIFICATION

I hereby certify that all materials required by Circuit Rule 30(a) and (b) are included in this Short Appendix of Appellant.

*s/ Sandra L. Blevins*
Sandra L. Blevins

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing have been served upon the following counsel of record this 28th day of November, 2017, via ECF Service:

Michael C. Terrell
Melissa A. Gardner
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204-2023

_s/ Sandra L. Blevins_
Sandra L. Blevins

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com